ZAGER, Justice.
The State appeals an adverse ruling on a motion which suppressed statements made by the defendant, Robert Lowe, as having been made in response to a promise of leniency, thereby rendering them involuntary. Lowe cross-appeals, claiming the district court erred in overruling his motion to suppress his statements as a violation of Miranda and, more specifically, as a violation of the ban on questioning a defendant after that defendant has invoked his right to counsel. Lowe further claims the district court erred in not suppressing all evidence found at the scene because the consent that led to the search of the premises was only obtained by prior police illegality. Lowe also claims that the consent to search provided by Cody Audsley was not voluntary and that he — Lowe—was re *563 moved from the area to prevent him from objecting to any search, in violation of the Fourth Amendment. We hold that the search was proper and that the motion to suppress the physical evidence obtained as a result of the search was properly denied. We further hold that because there was not sufficient exigency to justify the police reinitiating questioning of Lowe following Lowe’s request for counsel, the public safety exception to Miranda does not apply under the facts of this case, and therefore, Lowe’s statements were properly suppressed.
I. Background Facts and Proceedings.
At 10:00 p.m. on April 6, 2010, dispatch informed Detective Corey Schneden of the Ankeny Police Department that a female (Cindy) was being treated in the emergency room of a local hospital for a drug overdose. Schneden was advised the female likely ingested the drugs at Cody Audsley’s residence, a mobile home in Ankeny. Schneden went to Audsley’s residence for the purpose of interviewing her. He was accompanied by Officers Webb and Ripperger, both of whom were in uniform. Schneden was not in uniform, but was wearing a police department T-shirt, as well as a badge and gun.
Upon arrival, Schneden approached the main entrance on the south side of the mobile home. Ripperger was directly behind Schneden, and Webb was on a gravel drive east of and adjacent to Audsley’s mobile home. Webb went to the east side of the mobile home to prevent anyone from fleeing when Schneden knocked on the door. Webb was standing on a gravel driveway between Audsley’s mobile home and another mobile home and was about a foot away from a window with a partially open blind which was broken or bent. When Schneden knocked on the door, Webb observed Audsley retrieve something from the kitchen table and place it in a kitchen cabinet. Webb also observed Lowe run towards the back of the residence and out of view. At this point, Webb went to the yard on the north side of residence to determine whether Lowe had fled.
After Schneden knocked on the door, he identified himself as a police officer. Schneden asked for, and received, Auds-ley’s permission to enter the residence. As he entered, he introduced Ripperger and asked if they could ask Audsley a few questions. Audsley agreed. At this point, Webb was advised that both residents were now in the ■ living area, so Webb joined Schneden and Ripperger in the residence. Audsley never gave Webb explicit permission to enter, but never asked him to leave. At no point did Audsley ask the officers to leave.
After entering, the police encountered Lowe and asked him to identify himself. Lowe produced identification and stated he lived with his mother elsewhere in Ankeny. He specifically denied that he lived at Audsley’s residence. However, Lowe also stated that' he was staying at Audsley’s and that he was a guest. Later on in the evening, Lowe was allowed to change from gym shorts into sweatpants. Officers later found male clothing in a bedroom of the mobile home.
In response to questioning, Audsley denied using drugs with Cindy that day. During this initial questioning, Audsley was repeatedly reminded of the very serious medical condition Cindy was facing and was also confronted with Webb’s observation of Audsley grabbing something from the table and placing it in the kitchen cabinet. During this time, officers asked her at least three times for consent to search the residence. While she did not expressly deny consent the first two times, *564 she said no on the third occasion. At-that point, Schneden asked Lowe to step outside with him to talk out of Audsley’s presence. Schneden was outside with Lowe for only a few minutes. He asked Lowe if he knew what drugs Cindy might have taken earlier that day and explained that Cindy was in need of medical treatment and that the officers needed to. know what she might have taken. According to Schneden, Lowe was free to leave at any time. Lowe denied .having knowledge of any drugs Cindy might have taken.
While Schneden and Lowe were outside, Ripperger and Webb continued their questioning of Audsley. Webb told Audsley that the officers needed to know what Cindy had taken and that Cindy’s life might be in danger if Audsley did not tell them what she knew. Audsley then responded, “We smoked weed together. Do you want it?” At that point, Ripperger asked Audsley where the marijuana was, and Audsley pointed to a Del Monte fruit can on the coffee table. , Around this time, Schneden and Lowe reentered the residence, and Ripperger told Schneden that Audsley admitted smoking marijuana earlier in the day with Cindy and that there was marijuana hidden in the fruit can on the table. With Audsley’s permission, Webb picked the fruit can up. He then asked Audsley for consent to open it, which he received. After unscrewing a false bottom on the can, Webb found a pipe and marijuana. Once the marijuana was discovered, Audsley and Lowe were not free to leave. Audsley then refused to consent to a search of the rest of the residence.
Around midnight on April 6, 2010, Schneden contacted Detective Matthew Jenkins, a member of the Ankeny Police Department assigned to the Mid-Iowa Narcotics Task Force, to assist in obtaining a search warrant for Audsley’s mobile home. The probable cause for the search warrant was the discovery of the marijuana and drug paraphernalia.[1] The police did not begin searching the residence until 3:00 a.m. when Jenkins arrived with the search warrant. At that time, Lowe and Audsley were inside the residence and neither was in handcuffs. Jenkins provided each of them with the Miranda warning. While Audsley agreed to speak with Jenkins, Lowe immediately requested to speak with counsel. Lowe was then placed in a squad car. Audsley remained in the mobile home during the search.
Sometime during the search, Schneden entered the bathroom area and found what he believed to be components of a meth lab. This was not an active meth lab, and none of the officers reported smelling any odors associated with methamphetamine production. After being advised of this discovery, Jenkins became concerned for the safety of his officers and the neighbors. He spoke to Audsley, who confirmed that Lowe had been involved in manufacturing methamphetamine in. the past, but it was not to be made in the residence. Officers were told to suspend their search until Jenkins could speak to Lowe about whether there was anything dangerous in the residence.
Jenkins then went back to the squad car, opened the door, and reiterated to Lowe that he did not have to speak with him, that he was “not asking to get you [Lowe] in trouble,” but that he did not want to find any anhydrous. Lowe confirmed that there was nothing active going *565 on at that time, but Lowe stated that there was an empty anhydrous tank in the shed and that it was his, not Audsley’s.
On May 4, 2010, Lowe and Audsley were charged with conspiracy to manufacture a controlled substance, manufacturing a controlled substance, possession of anhydrous ammonia with intent to manufacture a controlled substance, and possession of lithium with intent to manufacture a controlled substance. Lowe moved to suppress his statements to police, alleging the statements were elicited in violation of his rights under the Fifth Amendment of the United States Constitution and article I, section 9 of the Iowa Constitution when Jenkins reinitiated questioning after Lowe invoked his right to counsel. After an evidentiary hearing, the district court denied the motion, finding that Jenkins reini-tiated questioning out of a concern for officer safety and that such questioning was proper under a public safety exception to Miranda.
Lowe filed another motion to suppress on June 17, alleging the search warrant for Audsley’s mobile home was based on information obtained by a prior illegal search in violation of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. After an additional evidentiary hearing, the district court overruled Lowe’s second motion, finding Audsley’s consent was freely and voluntarily given and there was no evidence of coercion in the record. The next day, Lowe moved to enlarge the findings and rulings, claiming the court insufficiently supported its findings and did not rule on all the issues before it, namely whether Audsley’s consent was induced by a prior illegal search. The motion to enlarge the findings and rulings was overruled by the motion judge. A motion to reconsider this ruling was brought before the trial judge who also denied it. Further motions on the issues involving the search and seizure of physical evidence were also denied.
On July 7, Lowe filed a renewed motion to suppress his statements and asked the court to reopen the record based on newly received recordings of his conversation with Jenkins. This motion additionally argued the statements should be suppressed as a promise of leniency under State v. McCoy, 692 N.W.2d 6 (Iowa 2005). Lowe argued his delay in asserting his claim of promissory leniency was based on the State’s failure to deliver the audio recordings of his exchange with Jenkins in a timely fashion.
In its resistance to the motion, the State argued the statements were not barred as a Miranda violation based on the public safety exception. The State also argued Lowe’s July 7 motion was untimely because it was not brought within forty days of arraignment, as required under Iowa Rule of Criminal Procedure 2ill(4), and any delay in Lowe receiving the recordings of his conversation with Jenkins was irrelevant because Lowe had a duty to disclose these facts to his attorney. After a hearing, the district court ruled that Jenkins was concerned for the safety of himself and others, so the public safety exception to Miranda would apply. However, the court ruled Jenkins’s statement, “I’m not asking to get you in trouble,” was a promise of leniency that Lowe would receive some benefit for his response and that led Lowe “to believe that if he answered the detective’s questions he could do so without fear of his answers being used against him.” Accordingly, the district court granted Lowe’s motion to suppress the statements made to Jenkins as a promise of leniency.
The State sought discretionary review of the ruling on the suppression of Lowe’s statements, and Lowe filed a cross-applica *566 tion for discretionary review of the rulings of the district court regarding the search and seizure of physical evidence. We now consider the merits of each party’s arguments.
II. Standard of Review.
Lowe claims that the search was conducted without Audsley’s valid consent, that the search was conducted without his consent, and that these actions violate the state and federal constitutions. Lowe also claims the police reinitiated questioning of him after he invoked his right to counsel. Our review of constitutional issues is de novo. State v. Lane, 726 N.W.2d 371, 377 (Iowa 2007); see also State v. Palmer, 791 N.W.2d 840, 844 (Iowa 2010) (holding we review de novo a district court’s decision to admit statements allegedly obtained in violation of the accused’s constitutional rights). This review requires us to make an independent evaluation of the totality of the circumstances as shown by the entire record, including'the evidence presented at the suppression hearings. Id. Because of the district court’s opportunity to evaluate the credibility of witnesses, we will give deference to the factual findings of the district court, but we are not bound by them. Id.
Lowe argues the evidence against him should be suppressed under both the state and federal constitutions. However, “we generally decline to consider an independent state constitutional standard based upon a mere citation to the applicable state constitutional provision.” State v. Effler, 769 N.W.2d 880, 895 (Iowa 2009) (Appel, J., specially concurring).[2]
III. The Physical Evidence Obtained in the Home and Shed.
Lowe claims that the physical evidence found in Audsley’s mobile home — the marijuana, pipe, and the precursor substances — must be suppressed because the evidence was obtained in violation of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. Though neither party provided the search warrant application to aid in our review, both parties agree, and the district court found, that the marijuana formed the basis for the search warrant. Therefore, if Audsley’s consent was invalid based on either the exploitation of a prior illegal search or seizure, or because Auds-ley’s consent was not voluntary, then there is no other basis for the warrant in the record, and the physical evidence obtained pursuant to that search warrant must be suppressed.
Lowe also points to Georgia v. Randolph, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), and claims that under Randolph, the police weré required to obtain his consent in order to use the evidence against him. Because they did not obtain his consent, Lowe argues that the marijuana and any evidence recovered pursuant to the search warrant predicated on the discovery of the marijuana cannot be used against him.
Lowe claims that Audsley’s consent was invalid. The Supreme Court has stated that “Fourth Amendment rights are personal rights which ... may not be vicariously asserted.” Rakas v. Illinois, 439 U.S. 128, 133-34, 99 S.Ct. 421, 425, 58 *567 L.Ed.2d 387, 394 (1978) (citation and internal quotation marks omitted); see also State v. Naujoks, 637 N.W.2d 101, 106 (Iowa 2001) (“The right afforded by the Fourth Amendment is specific to the individual and may not be invoked by third persons.”)- In order to object to the evidence on constitutional grounds, Lowe must show that his own constitutional rights, under either the state or federal constitutions, have been violated. If he can show that his rights have been violated, then “[w]e are not inclined to require defendant to make an independent showing of standing.” State v. Henderson, 313 N.W.2d 564, 565 (Iowa 1981); see also Minnesota v. Carter, 525 U.S. 83, 87-88, 119 S.Ct. 469, 472, 142 L.Ed.2d 373, 379 (1998) (noting that the “standing” doctrine was rejected in Rakas and “in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable”). Lowe’s ability “to assert a Fourth Amendment violation will stand or fall on a[his] ability to show a substantive violation which in turn is based on a showing of a legitimate expectation of privacy in the particular area searched or the particular objects seized.” Henderson, 313 N.W.2d at 565 (citing Rakas, 439 U.S. at 148, 99 S.Ct. at 432, 58 L.Ed.2d at 404).[3]
We employ a two-step approach to determine whether there has been a violation of the Fourth Amendment or article I, section 8 of the Iowa Constitution. State v. Fleming, 790 N.W.2d 560, 564 (Iowa 2010); see also Naujoks, 637 N.W.2d at 106; State v. Halliburton, 539 N.W.2d 339, 342 (Iowa 1995); State v. Eis, 348 N.W.2d 224, 226 (Iowa 1984). To satisfy the first step, an individual challenging the legality of a search has the burden of showing a legitimate expectation of privacy in the area searched. Fleming, 790 N.W.2d at 564.
The .determination of whether a person has a legitimate expectation of privacy with respect to a certain area is made on a case-by-case basis, considering the unique facts of each particular situation. The expectation must also be one that society considers reasonable.
Id. (citations and internal quotation marks omitted). Therefore, as a preliminary matter, we must determine whether Lowe had a reasonable expectation of privacy in Audsley’s mobile home. An expectation of privacy must be subjectively and objectively legitimate and will be determined “on a case-by-case basis.” Naujoks, 637 N.W.2d at 106. An overnight guest has a legitimate expectation of privacy in his host’s home. Id. Leaving possessions in another’s residence and making frequent visits are also factors that favor a legitimate’ expectation of privacy. State v. Lovig, 675 N.W.2d 557, 564 (Iowa 2004).
Although Lowe denied living at Audsley’s residence when the officers first entered, it appeared to the officers that Lowe was a guest of Audsley’s. Lowe had clothes and other items of a personal nature in Audsley’s mobile home. Additionally, according to the minutes of testimony, Lowe had been staying there for about six months. Based on these unique subjective and objective facts, we conclude Lowe had a legitimate expectation of privacy in Audsley’s mobile home.
Since Lowe has shown a legitimate expectation of privacy in Audsley’s mobile home, we must move to step two of the analysis in which we must decide *568 whether the State unreasonably invaded the protected interest. Fleming, 790 N.W.2d at 564; see also Naujoks, 637 N.W.2d at 106. “Warrantless searches .are per se unreasonable if they do not fall within one of the well-recognized exceptions to the warrant requirement.” Naujoks, 637 N.W.2d at 107. Consent searches are one of these exceptions. Id. To be valid, consent must be voluntary. See State v. Reinier, 628 N.W.2d 460, 465 (Iowa 2001).
The officers did not have a warrant when they first approached Audsley’s residence, but they received Audsley’s consent to enter the mobile home and ultimately to search the fruit can. Lowe claims that Audsley’s consent was the exploitation of prior police illegality, making it “fruit of the poisonous tree.” See Lane, 726 N.W.2d at 383. Lowe also claims Auds-ley’s consent was not voluntary. If either of these claims is accurate, then Audsley did not validly consent to the search of the fruit can. The State has not provided any basis other than Audsley’s consent to justify the search. If Audsley’s consent was involuntarily obtained, then the police would have unreasonably searched her residence which, as stated above, is an area where Lowe had a legitimate expectation of privacy. We now turn to Lowe’s challenges to Audsley’s consent.
A. Was Audsley’s Consent to Search the Result of Prior Police Illegality? Around 11:00 p.m., Webb received consent to search what appeared to be a can of Del Monte fruit cocktail that was sitting in Audsley’s living room. The fruit can contained a false bottom which held marijuana and a pipe. The State asserts Audsley voluntarily consented to the search. Lowe does not. dispute that Audsley told the officers they could search the fruit can. Lowe asserts that Audsley’s consent was only produced by exploiting prior police illegality, that her consent was not voluntary, and that even if it were, the evidence is still inadmissible against Lowe because he did not consent to the search.
Lowe points to two actions he claims constitute illegal searches and seizures pri- or to the consensual search of the fruit can. First, he claims the police searched the' mobile home illegally when Webb looked in the windows prior to the officers knocking at the door. Second, he claims the police seized Audsley and him without reasonable suspicion prior to the discovery of the marijuana when they exceeded the scope of Audsley’s consent to a knock and talk and “took over” the mobile home.
1. The activities of the police prior to entering the mobile home. We turn first to Lowe’s contention that Webb searched the mobile home by looking in the windows. A person in his dwelling with the window coverings almost closed certainly has some expectation of privacy. State v. Davis, 228 N.W.2d 67, 72 (Iowa 1975), overruled on other grounds by State v. Hanes, 790 N.W.2d 545, 550 & n. 1 (Iowa 2010). However, a search only occurs if there is a violation of an expectation of privacy “that society considers reasonable.” State v. Breuer, 577 N.W.2d 41, 46 (Iowa 1998). Regarding driveways, we have noted that “[i]t is common for solicitors, operators of motor vehicles, and other individuals to enter unsecured driveways of private residences.” State v. Lewis, 675 N.W.2d 516, 523 (Iowa 2004). Therefore, a defendant “could not have had a reasonable expectation of privacy in his driveway” and the Fourth Amendment would not prevent the police from entering it. Id.; see also State v. Dickerson, 313 N.W.2d 526, 531-32 (Iowa 1981).
Webb looked through Audsley’s windows while he was standing on the driveway of her mobile home. We have distinguished between merely looking into *569 a protected area from a public vantage point and making observations "with the naked eye — which is not a -search — and actually entering the protected area without the consent of the owner and conducting a warrantless search. See Lewis, 675 N.W.2d at 523-24. The police are free to observe areas they may not constitutionally enter without a warrant or some other recognized exception to the warrant requirement. See id. Officers entering areas that are open to the public do not wear a blindfold. Dickerson, 313 N.W.2d at 531. So long as officers make their observations from a location where they have a right to be, they have “a right to see what [is] visible from that position.” Id. at 532; see also Lewis, 675 N.W.2d at 523 (“[T]here is no legitimate expectation of privacy and no search within the meaning of the Fourth Amendment when authorities -can view an activity occurring in the curtilage from a public area.”).
In applying these legal principles to the facts of this case, we must analyze the significance of Webb’s location when he observed Audsley place something in the kitchen cabinet and saw Lowe run to the back of the mobile home.' Lowe claims that this observation constituted an illegal search and that it was later exploited to gain Audsley’s consent. Webb testified that he was outside the east window of the mobile home when he saw Audsley’ put something in the cabinet, that he was standing on the gravel drive on the east side of the house when this occurred, and that the blind was partially open so that he could readily see into the residence. As Audsley was placing something in the cabinet, Webb observed Lowe run to the back of the residence. It was only at that point that Webb entered the backyard. We need not determine whether entering the backyard was an invasion of a legitimate expectation of privacy because Webb did not confront Audsley or Lowe with any observations he made from that vantage point. Lowe’s claim is that confronting Audsley with the fact that Webb had seen her put something in the cabinet was an exploitation of prior police illegality. We disagree. When Webb observed Audsley in the kitchen, he was standing on the gravel driveway on the east side of the mobile home. This was a public vantage point where the officer had a right to be, and an observation made with the naked eye from that point is not a search. Lewis, 675 N.W.2d at 523. Since these observations were not illegal searches, confronting Audsley with them could not be the exploitation of a prior illegal search.
2. The officers’ alleged seizure of Lowe and Audsley after entering the mobile home. Lowe contends that the police detained both Audsley and him without reasonable suspicion and in violation of his Fourth Amendment rights and that this detention was exploited to gain Auds-ley’s later consent to search. As a preliminary matter, we note that ordinarily, a defendant cannot challenge the seizure of another person. 6 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.3, at 129 (4th ed.2004) [hereinafter LaFave] (“As for seizure of a person, it is clear that one person lacks standing to object to the seizure of another.”). This is because “a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure.” United States v. Padilla, 508 U.S. 77,’ 81, 113 S.Ct. 1936, 1939, 123 L.Ed.2d 635, 640 (1993). The mere seizure of another person would not, ordinarily, violate the Fourth Amendment rights of a third party. In this case, however, Lowe alleges that Audsley was improperly seized and *570 that prior illegal seizure was exploited to gain her consent to search the fruit can. Lowe is therefore permitted to challenge the seizure of Audsley because, if Audsley was illegally seized and that seizure was exploited to gain her consent, then her consent would be fruit of the poisonous tree, making it invalid. If her consent was invalid, then the police would have unreasonably searched an area where Lowe had a legitimate expectation of privacy, therein violating his rights under the state and federal constitutions.[4]
“Whether a ‘seizure’ occurred is determined by the totality of the circumstances.” State v. Wilkes, 756 N.W.2d 838, 842 (Iowa 2008). “The Supreme Court has long recognized that not all police contacts with individuals are deemed seizures within the meaning of the Fourth Amendment.” State v. Smith, 683 N.W.2d 542, 546 (Iowa 2004) (citation and internal quotation marks omitted). Encounters with the police remain consensual “[s]o long as a reasonable person would feel free to disregard the police and go about his business.” Id. at 547 (citation and internal quotation marks omitted). Generally, police questioning, and the responses it elicits, does not constitute a seizure. Wilkes, 756 N.W.2d at 843; State v. Reinders, 690 N.W.2d 78, 82 (Iowa 2004).
For a seizure to occur, there must be “objective indices of police coercion.” Wilkes, 756 N.W.2d at 843. The fact that an officer shows a badge, is “visibly armed,” or is in uniform has been given little weight in the analysis. See id. at 843. In order to maintain the consensual nature of the encounter, there should be “no show of authority, no intimidation, and no use of physical force by the officers in their encounter.” Reinders, 690 N.W.2d at 83. Other signs of a seizure would be “evidence the [officer] used a commanding or threatening tone, displayed a weapon, or touched [the suspect].” Smith, 683 N.W.2d at 547. In sum, we must determine whether the officers impaired Auds-ley’s ability to control her own residence or whether the “officers simply engaged [her], in conversation.” Reinders, 690 N.W.2d at 83.
When the officers arrived at Audsley’s residence, Sehneden identified himself as a police officer and asked for permission to enter in order to question Audsley regarding a woman who had overdosed on drugs. Audsley specifically consented to Sehneden and Ripperger’s entry, and she never objected to Webb entering immediately thereafter. Audsley implicitly consented to Webb’s entry. Audsley refused to consent to a search of her entire residence, but never asked the officers to leave. The only instruction Audsley ever gave the officers — that they did not have permission to search her entire residence — was followed.
Sehneden characterized his interaction with Lowe and Audsley as “conducting an interview.” During the course of that interview, Sehneden took down Audsley’s information, recorded Lowe’s information from his identification card, and asked for both of their phone numbers, which they provided without objection. During the course of the interview, Audsley willingly shared her interactions with Cindy during the day. Sehneden then asked questions about her relationship with Cindy. He also informed Audsley that Cindy stated that she had consumed something she had gotten from Audsley earlier that day. Audsley denied that she had given Cindy *571 anything illegal, but there is no evidence that the officers were lying about the statements Cindy made at the hospital or her current medical condition. Audsley admitted that she knew Cindy smoked marijuana, repeatedly denied giving Cindy anything, and denied having any drugs in the mobile home. She did not allow the officers to search because she felt there was no reason to. Webb then confronted Audsley with his observations that she hid something when the officers knocked on the door. When Audsley denied putting something in the cabinet, Webb stated, “Don’t lie to me, ‘cause I was standing right there at the window and watched you do it.”
At that point, Lowe was asked to go outside with Schneden to answer a few questions about his interactions with Cindy. While Lowe and Schneden were outside, Webb and Ripperger continued to question Audsley. Audsley denied putting anything in the cabinet, and Webb asked why she was lying to him. Webb or Rip-perger told Audsley, “The thing is, I don’t give a shit about arresting you; I don’t give a shit about charging you,” but that the doctors needed to know what Cindy took or “she may die from it.” One of the officers reminded Audsley that Cindy indicated she got something from Audsley earlier that day. At that point, Audsley stated, “We smoked weed together. Do you want it?” Lowe and Schneden then reentered the mobile home. At this point, Audsley gave Webb permission to pick up and open the fruit can containing the marijuana and drug paraphernalia. Schneden asked if the substance was only marijuana, and Audsley confirmed that it was. Auds-ley then refused to consent to a search of her entire residence. Webb and Schneden continued to try to find out if Audsley knew what else Cindy had taken, in addition to smoking marijuana, and Webb emphasized the danger that Cindy was in. However, these questions occurred after Audsley consented to the search of the fruit can, and therefore, they would not impact the validity ' of the consent that Audsley had already given.
During this encounter, all three officers were armed and had badges, and two were in uniform. The officers never drew their weapons or touched Audsley,. and they did not threaten her with arrest. The officers questioned Audsley regarding the overdose, and repeatedly reminded her that if she were not forthcoming with any information she had, it could lead to further health problems for Cindy. There is no evidence in the record that this claim was false. While the officers may have raised their voices, they did not use threats, intimidation, or physical force in such a way that would have impaired Audsley’s ability to control her own residence. There were no “commands” to Audsley that she was required to tell the officers what they wanted to know, only requests for information. There were no commands to Lowe that would give Audsley the impression she had been seized. Schneden asked Lowe to step outside with him, and Lowe •willingly did so. There is no evidence either Lowe or Audsley expressed any objection to Schneden’s request to talk to Lowe outside Audsley’s presence.[5]
After reviewing the totality of the circumstances, we determine that Audsley was not “seized” or detained in violation of the Fourth Amendment. Audsley allowed the police into her home and voluntarily *572 answered their questions. She willingly discussed her interactions with Cindy throughout the day and allowed Schneden to read text messages off of her phone. The officers were, as one might suspect, armed and wearing badges and uniforms. This does not transform a consensual encounter with the police into a detention. Audsley never asked the police to leave, and the one limit she placed on police activity inside her home — that the officers not search the entire residence — was respected until the officers obtained a search warrant.[6] Under the facts of this case, we cannot conclude that there was any prior illegal police action leading up to the consent obtained from Audsley.
B. Was Audsley’s Consent to Search Voluntary? A warrantless search conducted by free and voluntary consent does not violate the Fourth Amendment. Reinier, 628 N.W.2d at 465 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44, 36 L.Ed.2d 854, 858 (1973)). Consent is considered to be voluntary when it is given without duress or coercion, either express or implied. See Schneckloth, 412 U.S. at 227, 93 S.Ct. at 2048, 36 L.Ed.2d at 863. This test balances the competing interests of legitimate and effective police practices against our society’s deep fundamental belief that the criminal law cannot be used unfairly. See id. at 224-25, 93 S.Ct. at 2046-47, 36 L.Ed.2d at 861. Thus, the concept of voluntariness which emerges as the test for consent represents a fair accommodation of these interests and values. See id. at 229, 93 S.Ct. at 2048-49, 36 L.Ed.2d at 864. The State has the burden to prove the consent was voluntary, and voluntariness is a “ ‘question of fact to be determined from the totality of all the circumstances.’ ” Lane, 726 N.W.2d at 378 (quoting Schneckloth, 412 U.S. at 227, 93 S.Ct. at 2048, 36 L.Ed.2d at 862). “The State is required to establish the consent was voluntary by a preponderance of the evidence.” Reinier, 628 N.W.2d at 465.
The question of voluntariness requires the consideration of many factors, although no one factor itself may be determinative. See generally 4 LaFave, § 8.2, at 50-141 (discussing several factors bearing upon the validity of consent). In determining whether consent is voluntary, courts examine the totality of the circumstances, including relevant factors such as:
“(1) the individual’s age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [her] Miranda rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in *573 which an individual’s consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether consent was given in a public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.”
United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir.2010) (citation omitted)..
There are several additional factors this court can consider when determining whether consent is valid. “[Limitations on the nature of the crime under investigation and the objects sought by the search” can minimize the seriousness of possessing drugs for personal use and may subtly create a belief that there will be no consequences if the occupants consent to a search. Reinier, 628 N.W.2d at 469. “These comments by police constitute a subtle form of deception with no reasonable basis.” Id. However, a suspect acknowledging there are drugs in the house — thereby giving the officer probable cause to obtain a search warrant — supports the contention that consent was voluntarily obtained. Id.; see also 4 LaFave § 8.2(g), at 100. The court can also consider “knowledge by the defendant of the right to refuse to consent ... [and] whether police asserted any claim of authority to search prior to obtaining consent.” Reinier, 628 N.W.2d at 465 (citations omitted).
Audsley’s consent was obtained after a “knock and talk” encounter with the officers. The “knock and talk” procedure generally
involves officers knocking on the door of a house, identifying themselves as officers, asking to talk to the occupant about a criminal matter, and eventually requesting permission to search the house. If successful, it allows police officers who lack probable cause to gain access to a house and conduct a search.
The “knock and talk” procedure has generally been upheld as a consensual encounter and a valid means to request consent to search a house.
Id. at 466 (citations omitted). The State carries the burden of proving there was valid consent both to enter the home and to conduct the search. Id. at 467. The consent of officers to enter the mobile home in this case is not reasonably in dispute.
Turning to our analysis of the relevant factors relating to Audsley’s consent, Audsley voluntarily allowed multiple police officers into her home. She was twenty-eight years old, and there is nothing in the record to show that she suffered from any mental abnormality or was otherwise impaired by alcohol or drugs. The encounter with the police took place “on the familiar surroundings of the threshold of [Audsley’s] home.” See State v. Pals, 805 N.W.2d 767, 782 (Iowa 2011). Also, Auds-ley clearly knew she had the right to refuse consent to search because at all times she refused to consent to a search of her entire mobile home.[7]
*574 Although Audsley admitted smoking marijuana earlier that day, there was no evidence she was too impaired to consent, and her discussions with the officers do not indicate the contrary. The officers were at Audsley’s residence because Cindy, her friend, was at the hospital suffering from an overdose. Cindy had not told the doctors what she took that day, but had indicated that, whatever the substance was, she got it from Audsley. The officers reminded Audsley that if the doctors knew everything that Cindy had taken, the doctors could treat her more quickly. At that point, Audsley admitted she had been smoking marijuana with her friend Cindy earlier that day and then asked the officer, “Do you want it?” The officers then requested and received consent to take possession of the fruit can and received further consent to open the fruit can. Audsley did not testify at the suppression hearing. Therefore, it is impossible to know whether Audsley admitted smoking marijuana and allowed the police to examine it in order to help the police determine what Cindy took in order to save Cindy’s life, or whether she only consented to a search because her will had been overborne by the officers.[8] Though a close question, we believe, based on the behavior or the officers and the circumstances of the consent given, the former is a more accurate portrayal of Audsley’s consent than the latter.
The questioning of Audsley was of a short duration, perhaps twenty minutes. There is no evidence of threats or physical intimidation. The record does not disclose that the officers made any misrepresentations regarding Cindy’s medical condition in order to obtain Audsley’s consent to search the fruit can.[9] The police never claimed they could search without Auds-ley’s consent. While officers did ask for consent several times before the limited consent was granted, this is just one of the factors which the court can rely on in determining whether the ultimate search was voluntary. See United States v. Cedano-Medina, 366 F.3d 682, 688 (8th Cir.2004) (“[T'jhere is certainly no legal rule that asking more than once for permission to search renders a suspect’s consent involuntary, particularly where the suspect’s initial response is ambiguous.” (citation and internal quotation marks omitted)); see also 4 LaFave § 8.2(f), at 97-100. Although we acknowledge prior unreasonable searches can also be a factor in this analysis, we have already concluded there was no prior misconduct by the police.
There are also factors that weigh against the voluntariness of Audsley’s consent. One of the officers told Audsley, “The thing is, I don’t give a shit about arresting you; I don’t give a shit about charging you,” and that the doctors needed to know what Cindy took or “she might die from it.” These statements are troubling. In Reinier, we noted:
The officers told Reinier prior to obtaining her consent that they .were not looking for small quantities of drugs but “meth labs” and “major dealers.” These comments bear upon the voluntariness of the consent because they are limita *575 tions on the nature of the crime under investigation and the objects sought by the search. The comments also tend to minimize the seriousness of possessing drugs for personal use or casual -sales, and subtly create a false belief that no adverse consequences will result from a search if there is no meth lab in the house and the occupants are not major dealers. These comments by police constitute a subtle form of deception with no reasonable basis.
Reinier, 628 N.W.2d at 469 (citations omitted). Unlike in Reinier, the officer made it clear that he was looking for small amounts of drugs that would be used for personal use or casual sales. In that respect, he did not “subtly • create a false belief that no adverse consequences will result from a search if there is no meth lab in the house and the occupants are not major dealers.” Id.
He did, however, tell Audsley that he was not interested in charging her. The officers indicated early on that they were interested in searching the entire premises in order to determine what drugs Cindy might have taken. This officer’s comment, much like the officer’s comment in Reinier, “tend[ed] to minimize the seriousness of possessing drugs for personal use or casual sales.” Id. As such, it was a “subtle form of deception.” Id. However, the subtle use of deception to gain consent to search is only one factor among many when evaluating the totality of the circumstances to determine whether consent is voluntary. Id. We will therefore consider Webb’s statement as one of many factors in our analysis.[10]
While presenting a close case, in our review of the totality of the circumstances, we conclude that Audsley’s consent to search the can of fruit was voluntary.[11]
*576 We now turn to the issue of whether Audsley’s consent to search the fruit can is binding on Lowe.
C. The Impact of Audsley’s Consent on Lowe. We have long held that a guest without exclusive possession of an area assumes the risk that his host will allow others into the common areas. State v. Knutson, 234 N.W.2d 105, 107 (Iowa 1975). Additionally, a cohabitant assumes the risk that other cohabitants will consent to searches of shared living areas. Id. (citing United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249-50 (1974)). If a person with authority grants consent to search shared areas, that authority is binding as to all other people who share the area. State v. Bakker, 262 N.W.2d 538, 546 (Iowa 1978).
Authority to consent includes not only actual, but also apparent, authority. Illinois v. Rodriguez, 497 U.S. 177, 185-87, 110 S.Ct. 2793, 2799-2801, 111 L.Ed.2d 148, 159-60 (1990). Apparent authority will validate a search where officials “enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry” had the authority to do so. Id. at 186, 110 S.Ct. at 2800, 111 L.Ed.2d at 160. We apply an objective standard when analyzing consent and ask “would the facts available to the officer at the moment ... warrant a [person] of reasonable caution in the belief that the consenting party had authority over the premises?” Id. at 188, 110 S.Ct. at 2801, 111 L.Ed.2d at 161 (citations and internal quotation marks omitted) (alteration in original).
The United States Supreme Court has recently announced a narrow exception to the. rule that a cotenant’s consent is binding on other cotenants. Under the Fourth Amendment, “a physically present co-occupant’s stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him.” Randolph, 547 U.S. at 106, 126 S.Ct. at 1519, 164 L.Ed.2d at 217. Even under this rule, however, the police can only accord “dispositive weight to the fellow occupant’s contrary indication when he expresses it.” Id. at 121-22, 126 S.Ct. at 1527, 164 L.Ed.2d at 227 (emphasis added). The only possible way in which a co-oecu-pant could successfully invoke this protection without being physically present and objecting would be if the police have “removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection.” Id. at 121, 126 S.Ct. at 1527, 164 L.Ed.2d at 226-27.
Audsley owned the mobile home where police initially obtained her consent to enter. Additionally, the fruit can with the marijuana was found in the common area of the mobile home sitting out on the table. Not surprisingly, Lowe has not claimed that he was the exclusive owner of the fruit can. Since the fruit can was located in the living room of her home, Audsley had the actual and apparent authority to consent to a search of it. There is no claim that any part of the mobile home was exclusively Lowe’s. Therefore, any areas of the mobile home where Lowe could claim an expectation of privacy would be shared areas, and he would have to expect Audsley could consent to searches of those areas. Cf. Fleming, 790 N.W.2d at 565-67. Most importantly, despite being present in the mobile home for all but a few minutes, Lowe never objected *577 to the entry by the police or the search of the fruit can. Further, the record evidence in this case does not support a conclusion that Lowe was removed from the premises for the improper purpose of his possible objection to the entry by officers or the search of the fruit can. Lowe was not “removed” by the police. He was asked to step outside, which he willingly did. The police did not ask for consent to pick up or open the fruit can until after Lowe had reentered the residence.
Lowe asks for a more expansive definition of “physically present” in the Randolph analysis under the Iowa Constitution. A more expansive definition would not change our analysis. Lowe’s claim under Randolph fails because he failed to object, not because he was not “present.”
Lowe also asks this court to declare that article I, section 8 of the Iowa Constitution requires the police obtain affirmative consent from all physically present cotenants, as opposed to merely honoring their affirmative objections. Randolph does not require this affirmative step. In Randolph, the Court acknowledged “it is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant’s invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, ‘stay out.’ ” Randolph, 547 U.S. at 113, 126 S.Ct. at 1522-23, 164 L.Ed.2d at 221. The police should also be required to follow this social norm:.
Since the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all.
Id. at 114, 126 S.Ct. at 1523, 164 L.Ed.2d at 222.
The Supreme' Court clearly noted it would only “afford[ ] dispositive weight to the fellow occupant’s contrary indication when he expresses it.” Id. at 121-22, 126 S.Ct. at 1527, 164 L.Ed.2d at 227. The reason for requiring a cotenant to actually voice his objection was that an alternative rule “requiring] the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received” would “needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field.” Id. Lowe has not provided us with any reason to interpret the Iowa Constitution any differently. Just as the United States Supreme Court refused to require the police to find every potential cotenant who may wish to object to the search and obtain their consent, we will not require the police to obtain the affirmative assent of every present cotenant prior to conducting a search.
Nothing in this record would support the conclusion that Lowe was removed from the premises to prevent him from objecting to the search. Audsley had the authority to consent to the entry by police and the limited search of the fruit can on the coffee table. Lowe was physically present at the time, but did hot object to the entry by police or the search of the fruit can. Because Lowe did not object, Audsley’s consent to search is valid as to Lowe, and allowing the evidence found to be used against him does not violate Lowe’s rights under either the federal or state constitutions.
D. Conclusion. Audsley validly consented to a search of a common area in the mobile home she owned. The record evidence in this case does not support the conclusion Lowe was removed by the police to prevent his objection to the search. Lowe never objected to the search even though he was physically present when the *578 consent to search the fruit can was given. The search of the fruit can with the false bottom was valid.
Lowe also attempts to attack the search warrant that led to the discovery of the other physical evidence the State seeks to use against him. This is based on the claim that the marijuana which formed the probable cause for the search warrant was the product of illegal police action or involuntary consent. The parties agree, and the district court found, that the marijuana found as a result of that search did in fact supply the probable cause that supported the warrant application. Since the consent that led to the discovery of the marijuana was not based on any prior illegal police action, and Audsley’s consent was voluntary, any attack on the search warrant is without merit. The warrant was properly obtained, and therefore the physical evidence seized as a result of that warrant is admissible against Lowe.
IV. Lowe’s Statements to Jenkins Following Lowe’s Request for an Attorney.
Upon his arrival with the search warrant, Jenkins read Audsley and Lowe their Miranda warnings. Lowe immediately requested an attorney, and he was placed in a squad car while the search of the residence continued. Once officers discovered what they believed to be components of a meth lab in the bathroom, Jenkins approached Lowe and asked if there was any anhydrous ammonia or other dangerous substances on the property. In response to the State’s arguments on discretionary review regarding the promise of leniency issue, Lowe contends this reinitiation of questioning violated his Fifth Amendment right to counsel.[12] The State does not dispute that Lowe was subjected to a custodial interrogation or that Lowe had affirmatively invoked his right to counsel, when Jenkins began to question Lowe regarding the presence of anhydrous ammonia on the property. The State contends Jenkins’s questions fall under the public safety exception to the Miranda warnings.
After receiving the Miranda warnings, a suspect may waive his rights and respond to interrogation, or a suspect can request counsel. Edwards v. Arizona, 451 U.S. 477, 484, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378, 385 (1981). “Under the Federal Constitution, the authorities must follow different procedural safeguards to re-interrogate a suspect depending on whether the suspect has invoked his or her right to remain silent or the right to the presence of counsel.” Palmer, 791 N.W.2d at 848. In Edwards, the Court established a clear, bright-line rule: If the suspect requests counsel, all interrogation must cease until the detainee is provided with an attorney or “the accused himself initiates further communication, exchanges, or conversations with the police.” Edwards, 451 U.S. at 484-85, 101 S.Ct. at 1885, 68 L.Ed.2d at 386; see also Palmer, 791 *579 N.W.2d at 848 (“[T]he Court in Edwards adopted a per se ban on any further questioning of a suspect without the presence of counsel, for an indefinite duration, after the suspect invokes the right to counsel.”). The Court reasoned that invoking the right to counsel is a “significant event” and once an accused has requested an attorney, he has an “‘undisputed right’ under Miranda to remain silent and to be free of interrogation.” Edwards, 451 U.S. at 485, 101 S.Ct. at 1885, 68 L.Ed.2d at 386-87 (citation omitted).
The State does not dispute that Lowe requested an attorney. Instead, the State seeks to extend the “public safety exception” to the Miranda requirements to situations like the one here, where the accused has requested an attorney and the police subsequently reinitiate questioning. We have not previously decided whether the public safety exception applies after the Miranda protections have been invoked.
The public safety exception to the Miranda warnings was first announced in New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), and has since been adopted in Iowa. See State v. Deases, 518 N.W.2d 784, 791 (Iowa 1994). Under the public safety éxception, when “police officers ask questions reasonably prompted by a concern for the public safety,” without first giving suspects Miranda warnings, the responses those questions elicit do not violate Miranda. Quarles, 467 U.S. at 656, 104 S.Ct. at 2631-32, 81 L.Ed.2d at 557. The justification given for the rule is straightforward: “[T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment’s privilege against self-incrimination.” Id. at 657, 104 S.Ct. at 2632, 81 L.Ed.2d at 558. In ordinary interrogations, the Court reasoned, Miranda warnings are procedural safeguards which make a suspect less likely to divulge information, and their primary “social cost” is fewer convictions. Id. at 656-57, 104 S.Ct. at 2632, 81 L.Ed.2d at 557. In the public safety situation, however, “the cost would have been something more than merely the failure to obtain evidence.” Id. at 657, 104 S.Ct. at 2632, 81 L.Ed.2d at 558. The cost in these situations would be increasing the risk of harm to the public. Id.
We have noted that the public safety exception is closely drawn and narrow in scope. In re J.D.F., 553 N.W.2d 585, 588 (Iowa 1996); see also Quarles, 467 U.S. at 658, 104 S.Ct. at 2632, 81 L.Ed.2d at 558. For the exception to apply, there must be a threat to public safety and an “immediate necessity” for the information the officer seeks to obtain by questioning a suspect in violation of Miranda. Quarles, 467 U.S. at 657, 104 S.Ct. at 2632, 81 L.Ed.2d at 557. The exception will only apply in situations where there is “sufficient exigency to justify the questioning.” In re J.D.F., 553 N.W.2d at 588. A missing gun in a field creates “sufficient exigency” to justify pre-Miranda questioning. Id. at 587-88. The exception also applies to the discovery of an active methamphetamine lab. State v. Simmons, 714 N.W.2d 264, 275 (Iowa 2006).
In Simmons, officers could smell anhydrous ammonia from outside the door of an apartment. Id. at 269. After requesting permission to enter the apartment and receiving no response, officers forced the door open. Id. Once the door was open, the smell of anhydrous ammonia was strong enough to make one officer’s eyes water. Id. Without reciting Miranda warnings, the officers asked the defendant whether there was an active meth lab in the apartment, and the defendant said there was. Id. at 269-70. The officers then evacuated the residents of the apart *580 ment across the hall, immediately called dispatch, and did not reenter the area without protective gear. Id. at 270. We held
[the officer’s] inquiries as to the presence and status of a methamphetamine lab were for the purpose of obtaining information that would help him safely address the potentially volatile and dangerous situation confronting the officers at the scene, and not solely to obtain incriminating information from [the defendant].
Id. at 275. Particularly, we noted the strong odor of anhydrous ammonia in the apartment. Id. The odor itself posed a safety risk to the officers and the neighbors, and that risk justified the officers’ failure to recite the Miranda warnings prior - to questioning the defendant about the presence and nature of a meth lab. Id. These circumstances demonstrated sufficient exigency for the public safety exception to apply.
In this case, the officers had been in Audsley’s mobile home for nearly five hours before officers found inactive components of a meth lab and Jenkins reinitiated questioning of Lowe. During that time, the officers did not report any odor of anhydrous ammonia or ether, nor did they report any physical effects such as watering eyes. Jenkins only reinitiated questioning after components of a meth lab were discovered, but he did not order the other officers out of the mobile home or evacuate the surrounding residences. Jenkins testified that there was material in one of the bedrooms that smelled of anhydrous ammonia, but this material had not been located at the time Jenkins reinitiated questioning. Jenkins also testified Lowe told him that he was not actively manufacturing methamphetamine in the mobile home at the time of the search. Audsley confirmed that Lowe had manufactured methamphetamine in the past, but she had told him he could not do it in the house. The only basis for the reinitiation of interrogation was- the discovery of the inactive components of a meth lab in the bathroom.
The discovery of inactive components of a meth lab does not provide sufficient exigency to justify a public safety exception to the requirements of Miranda and its progeny. Unlike the officers in Simmons, where the exception was applicable, Jenkins was not confronted with an active methamphetamine lab. None of the officers in Audsley’s mobile home reported any odors of anhydrous ammonia or ether. There was no evidence that the active “cooking” of meth was taking place. Additionally, Jenkins did not feel the threat was severe enough to evacuate Audsley and his fellow officers, or to warn nearby residents and remove them from the potentially dangerous area. Under these facts, we cannot conclude there was sufficient exigency for the public safety exception to apply.
Once a suspect requests an attorney, all interrogation must cease. Edwards, 451 U.S. at 484-85, 101 S.Ct. at 1885, 68 L.Ed.2d at 386-87; see also Palmer, 791 N.W.2d at 847-48. Jenkins reinitiated questioning prior to Lowe speaking with an attorney. Because the State has not shown sufficient exigency to invoke the public safety exception, the statements made by Lowe after he requested counsel were taken in violation of Miranda and Edwards. Because there was insufficient exigency to invoke the public safety exception in this case, we need not determine whether the public safety exception could ever apply in a situation where the suspect had already requested an attorney. Under the facts and circumstances of this ease, and based upon our prior precedent, we hold that there is insufficient exigency to justify the officer’s *581 departure from the Miranda requirements. Since the statements are suppressed on this basis, we need not address the issue of promissory leniency.
V. Disposition.
The police did not violate Lowe’s federal or state constitutional rights when they searched the fruit ban on the coffee -table in Audsley’s living room. Audsley’s consent was not the result of prior illegal police action and therefore the evidence is not “fruit of the poisonous tree,” nor was her consent involuntary under the totality of the circumstances that existed in this case. Additionally, despite being physically present, Lowe never objected to the entry of the police or the search of the fruit can. As such, the trial court was correct in denying the motion to suppress the physical evidence obtained pursuant to the consent and the search warrant. Also, when the police reinitiated questioning of Lowe after he requested an attorney, they violated his constitutional rights under Miranda. Accordingly, those statements were properly suppressed. On discretionary review from the district court’s ruling granting the motion to suppress the statements, the ruling on the motion to suppress is affirmed. On cross-application for discretionary review, the district court’s ruling denying the motion to suppress the physical evidence obtained based on the alleged violation of the United States and Iowa Constitutions is affirmed.
DECISION OF THE DISTRICT COURT AFFIRMED ON APPEAL; DECISION OF THE DISTRICT COURT AFFIRMED ON CROSS-APPEAL AND CASE REMANDED.
CADY, C.J., concurs; APPEL, WIGGINS,-and HECHT, JJ., concur in part and dissent in part; and WATERMAN and MANSFIELD, JJ., concur specially.

. The record does not contain the application for the search warrant or the search warrant itself. However, both Lowe and the State agree that the marijuana and drug paraphernalia found as a result of the consensual search formed the basis for the search warrant.

. On appeal, Lowe only makes the argument that the Iowa Constitution should be interpreted differently than the United States Constitution when he claims the police should have been required to obtain his consent before searching the fruit can. Therefore, unless we indicate otherwise, we assume for the purposes of this appeal that the United States Constitution and the Iowa Constitution should be interpreted in an identical fashion. State v. Wilkes, 756 N.W.2d 838, 842 n. 1 (Iowa 2008).

. We note that it is not necessary for a defendant to make an independent showing of standing because "[t]he standing issue inheres in the [determination of a legitimate expectation of privacy].” State v. Eis, 348 N.W.2d 224, 226 (Iowa 1984).

. From this point on, we will only deal with the alleged seizure of Audsley. Lowe never consented to the search of the fruit can, mak-mg it impossible for the police to exploit a seizure of Lowe to gain his consent.

. We also note that, despite the claims in his brief, Lowe was not directed where to sit and officers did not accompany him while he changed into sweatpants, until after the marijuana was discovered. These actions, therefore, could not have led Audsley to feel as though she had been “seized” by the police prior to her consent to search.

. Lowe’s motion to suppress sought to exclude evidence obtained not only after consent to search was obtained, but also after police illegality. We have stated the following:
"When a claim of consensual search is preceded by illegal police action ..., the government must not only show the voluntariness of the subsequent consent under the totality of the circumstances, but must also establish a break in the illegal action and the evidence subsequently obtained under the so-called "fruit of the poisonous tree” doctrine.
... Thus, there are two issues to analyze in a consent-to-search case such as this: (1) voluntariness under the totality of the circumstances, and (2) exploitation under the fruit of the poisonous tree doctrine.”
State v. Lane, 726 N.W.2d 371, 377 (Iowa 2007) (citations omitted). The two concepts are not the same. However, because we conclude that no prior illegal police action has been established, we will focus on whether the consent was voluntary.

. Though both parties presented evidence and made arguments regarding the voluntariness of Audsley's consent to search, neither party presented evidence on the "knowing” and voluntary nature of her consent (requiring law enforcement to advise her of her right to refuse consent to search). Audsley did not testify at the suppression hearings. There is no direct evidence of her knowledge of her right to refuse consent to a search. This is not surprising considering Lowe only claims that Audsley’s consent was involuntary, not that it was given without the knowledge she could refuse. Moreover, Lowe has not asked this court to adopt a knowing and voluntary requirement under article I, section 8 of the *574 Iowa Constitution. Without a full development of the legal and factual arguments on this issue, we decline to adopt a new standard regarding consent in this case.

. It is certainly possible that Audsley would risk being charged with a minor drug possession offense in an effort to help the police determine what was causing her friend's health problems.

. The officers repeatedly reminded Audsley of Cindy’s medical condition as a way of pressuring her to tell them what she knew. However, there is nothing in the record to indicate that these claims were inaccurate.

. Lowe has not claimed that the officer’s statement was a promise of leniency or that such a promise might render Audsley's consent involuntary, regardless of other factors. Instead, Lowe makes a generalized attack under the totality of the cireumstances. Accordingly, we have limited our analysis to the challenges actually made by Lowe.
This approach is consistent with our past cases. Reinier treated a statement that minimized the consequences of possessing small amounts of drugs as one factor in the analysis of whether consent to search was voluntary. On other occasions, we have held that statements made in response to a promise of leniency are per se inadmissible. See State v. Kase, 344 N.W.2d 223, 225-26 (Iowa 1984). Evidence improperly obtained in violation of the Fourth Amendment is excluded from the trial under the exclusionary rule in an effort to deter police misconduct, "to provide a remedy for a constitutional violation!)] and to protect the integrity of the judiciary.” Lane, 726 N.W.2d at 392; see also State v. Cline, 617 N.W.2d 277, 289 (Iowa 2000), abrogated on other grounds by State v. Turner, 630 N.W.2d 601, 606 n. 2 (Iowa 2001). On the other hand, "[sjtatements exacted by promissory leniency are not excluded on prophylactic grounds to deter police misconduct; they are excluded on grounds that statements exacted under such circumstances are unreliable.” Kase, 344 N.W.2d at 226. -When a statement is made in response to a promise of leniency, the statement’s "probative value, if any exists, is substantially outweighed by the danger of confusion of issues and would be misleading to the jury under Iowa rule of evidence 403.” State v. McCoy, 692 N.W.2d 6, 28 (Iowa 2005) (citation and internal quotation marks omitted). When reviewing a suspect's consent to search the totality-of-the-circumstances test is used, and under, that test, whether, an officer has minimized the seriousness of possessing drugs is one factor among many that the court must- consider.

. We recently decided the case of State v. Pals, 805 N.W.2d 767 (Iowa 2011). While oil its face it may appear that the decision we make today is inconsistent with our decision in Pals, the cases are clearly distinguishable. Pals involved the “inherently coercive” setting of a traffic stop where "Pals found himself seized in the front seat of a squad car with his own vehicle parked on the side of the public highway.” Id. at 782-83. We noted the difference between a request for consent *576 during a traffic stop and “an encounter on the familiar surroundings of the threshold of one's home.” Id. at 782.

. The State claims the issue of the Miranda violation is not properly before the court because Lowe did not file a cross-application for discretionary review of the district court's determination that the public safety exception was applicable in this case. The district court ultimately suppressed the statements based on the promissory leniency argument. We have stated that "we will uphold a ruling of the court on the admissibility of evidence on any ground appearing in the record, whether urged below or not.” State v. McCowen, 297 N.W.2d 226, 227 (Iowa 1980); see also State v. Parker, 747 N.W.2d 196, 208 (Iowa 2008). In this case, the issue was actually argued in front of the district court, which heard testimony from the officers at the scene regarding the potential dangers facing the officers and the reasons for reinitiating interrogation. The record contains more than sufficient evidence for us to rule on the public-safety-exception issue, and it is properly before us.