STATE of Iowa, Appellee,

v.

Clarence SIMPSON, Appellant.

No. 97–2200.

Supreme Court of Iowa.

Dec. 23, 1998.

Linda Del Gallo, State Appellate Defender, and Robert P. Ranschau, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Robert P. Ewald, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Brad Walz, Assistant County Attorney, for appellee.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, SNELL, and CADY, JJ.

LAVORATO, Justice.

The jury convicted Clarence Simpson of possession of a controlled substance (cocaine). He appeals, contending that the district court violated his constitutional rights when it refused to grant use immunity to his proffered witness. We disagree and affirm.

Waterloo Police Officer Robert Hewitt stopped a vehicle driven by Clarence Simpson for having expired license plates. Jamie Keller occupied the front passenger seat and Rodney Caeser occupied the rear passenger seat.

Simpson consented to a search, at which point Hewitt had both passengers exit the vehicle and stand to the rear of it. Hewitt allowed Simpson to remain in the vehicle because Simpson was disabled.

At this point, Officer Randall Chapman arrived on the scene as backup. Hewitt began searching Simpson's vehicle and found one crack pipe located underneath the floor

mat in the front passenger seat. Hewitt then went to the rear of the vehicle to question Keller about the pipe. As Hewitt was talking to Keller, Chapman saw what appeared to be a crack pipe come flying out of the opened passenger front door and land in the grass. Chapman told Hewitt what he had just seen. Hewitt turned and saw a silver pipe lying in the grass next to the curb by the opened passenger door. Hewitt seized the pipe and thereafter arrested Simpson. After searching both passengers and finding nothing on them, the police let them leave.

Both pipes had burnt residue of crack cocaine. The police later searched Simpson's vehicle and found eight to ten twist ends of baggies, scattered on the front and rear floors and on the seats. They also found several push rods. The twist ends and push rods are associated with the use of crack cocaine.

The State charged Simpson with possession of a controlled substance in violation of Iowa Code section 124.401(5) (1997). During opening statements, the defense counsel told the jury that Caeser would testify that he was the one who had thrown the crack pipe out of Simpson's vehicle.

Simpson called Caeser to testify. After talking to an attorney appointed for him, Caeser exercised his right against self-incrimination and refused to testify. Simpson then asked the court to grant Caeser use immunity. The State resisted, stating that it was neither going to grant use immunity nor would it ask the court to do so. The court denied Simpson's counsel's request.

The defense counsel then stated for the record that Caeser would testify that he threw the crack pipe out of Simpson's vehicle before he was asked to get out. Simpson later denied any knowledge of the pipes and of the other incriminating evidence found in his vehicle. He also denied throwing one of the pipes out of his vehicle.

■ The sole issue on appeal is whether the district court violated Simpson's Sixth and Fourteenth Amendment rights when it denied his request for a grant of use immunity to Caeser. Because Simpson raises constitutional issues, our review is de novo. *State v. Fox*, 491 N.W.2d 527, 530 (Iowa 1992). In our review, we independently evaluate the totality of the circumstances as evidenced by the whole record. *Id.*

## I. Applicable Law.

■ **A. The right to present a defense.** The Sixth Amendment to the Federal Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The right to present a defense stems from this Sixth Amendment right to compulsory process. *Washington v. Texas*, 388 U.S. 14, 18–19, 87 S.Ct. 1920, 1922–23, 18 L.Ed.2d 1019, 1023 (1967); *Fox*, 491 N.W.2d at 530–31.

■ The right to present a defense is essential to a fair trial. For that reason, it is an incorporated right in the Due Process Clause of the Fourteenth Amendment:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington*, 388 U.S. at 19, 87 S.Ct. at 1923, 18 L.Ed.2d at 1023; *Fox*, 491 N.W.2d at 531.

Because the right to present a defense is incorporated in the Due Process Clause, the right is binding on the states. *Washington*, 388 U.S. at 19, 87 S.Ct. at 1923, 18 L.Ed.2d at 1023; *accord Fox*, 491 N.W.2d at 531; *see* U.S. Const. amend. XIV ( "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."). Since *Washington*, the Supreme Court has ignored mentioning the Sixth Amendment genesis of the right to present a defense and has simply relied on the Due Process Clause alone when deciding issues in this area. *See,*

e.g., *Webb v. Texas,* 409 U.S. 95, 98, 93 S.Ct. 351, 353–54, 34 L.Ed.2d 330, 333 (1972) (per curiam) (holding that judge's threatening remarks, directed only at the single witness of the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment).

**B. Use immunity for exculpatory testimony.** Use immunity

> refers to an order of court that compels a witness to give self-incriminating testimony while at the same time prohibiting the use of such testimony in a subsequent prosecution of the witness. Use immunity protects a witness only against the actual use of the compelled testimony and evidence derived directly or indirectly from such testimony. In contrast, transactional immunity protects the witness against all later prosecutions related to matters about which the witness testifies.

*Fox,* 491 N.W.2d at 533.

We have recognized that the district court has no statutory authority to grant use immunity. *Id.* Thus, if the district court has authority to grant use immunity, such authority must arise from the court's inherent powers. *Id.* The county attorney, on the other hand, has discretion to seek court authority granting immunity to a witness. *See* Iowa R.Crim. P. 19(3); *Fox,* 491 N.W.2d at 533. We have interpreted rule 19(3) as providing both use and transactional immunity. *Allen v. Iowa Dist. Ct.,* 582 N.W.2d 506, 509–10 (Iowa 1998) (per curiam).

There is some authority that the Sixth Amendment right to present a defense requires that the court grant use immunity to defense witnesses who refuse to testify on the basis of their Fifth Amendment right not to incriminate themselves. *See United States v. Angiulo,* 897 F.2d 1169, 1190 (1st Cir.1990); *see also* Note, *The Sixth Amendment Right to Have Use Immunity Granted to Defense Witnesses,* 91 Harv. L.Rev. 1266 (1978). *Angiulo* mentions two emerging theories requiring such immunity: the effective defense theory and the prosecutorial misconduct theory.

**1. The effective defense theory.** This theory, accepted in only a small minority of cases, "holds that a court has the inherent power to immunize witnesses whose testimony is essential to an effective defense." *Angiulo,* 897 F.2d at 1190. The Third Circuit has embraced this theory. *See Government of the Virgin Islands v. Smith,* 615 F.2d 964, 964 (3rd Cir.1980). *Smith* recognized that use "immunity may be required for a defense witness if realistic meaning is to be given to a defendant's due process rights to have exculpatory evidence presented to the jury." *Id.* at 970.

Giving due regard "to the unique and affirmative nature of the immunity remedy and fundamental considerations of separation of powers," *Smith* insisted that "grants of [use] immunity to defense witnesses must be bounded by special safeguards and must be made subject to special conditions." *Id.* at 972. Those special safeguards and conditions included the following: "the defense witness must be available to testify; the proffered testimony must be clearly exculpatory; the testimony must be essential; and there must be no strong governmental interests which countervail against a grant of immunity." *Id.*

> *Smith* emphasized that
>
> the defendant must make a convincing showing sufficient to satisfy the court that the testimony which will be forthcoming is both clearly exculpatory and essential to the defendant's case. Immunity will be denied if the proffered testimony is found to be ambiguous, not clearly exculpatory, cumulative or if it is found to relate only to the credibility of the government's witnesses.

*Id.*

If the defendant convinces the court that the testimony is both clearly exculpatory and essential, "the focus then shifts to consideration of the state's countervailing interests, if any," which dictate against the grant of use immunity. *Id.* at 972–73. The burden to show these strong countervailing interests is on the State. *Id.* at 973.

Those interests include the fact that the State may have a legitimate interest in pros-

ecuting the very witness whom the defendant seeks to immunize and in the manner of prosecution. *Id.* at 973. If the State's interest in prosecuting the witness can be accommodated even with the grant of use immunity, then there are no strong governmental interests which countervail against a grant of use immunity. *Id. Smith* described several ways this could occur:

[T]he government may have already assembled all the evidence necessary to prosecute the witness independent of the witness' testimony. Or the government may be able to "sterilize" the testimony of the immunized witness and so isolate it from any future testimony of the witness that it would not trench upon any of the witness' constitutional rights if he were subsequently to be prosecuted. Finally, the government may seek a postponement of the defendant's trial so that it may complete its investigation of the defense witness who is the subject of an immunity application.

*Id.* at 973 (citation omitted).

In *Fox*, we touched on the issue of granting use immunity for essential exculpatory testimony, but decided we did not have to reach the issue. *Fox*, 491 N.W.2d at 533. We gave the following policy reasons frequently cited for rejecting the theory:

First, in granting use immunity to defense witnesses, the judicial branch risks encroaching on policy assessments traditionally made by the executive branch.

Second, defense use immunity significantly impairs the State's ability to prosecute immunized witnesses and increases the State's burden of proof. In such trials, the State must overcome the additional requirement that its evidence is "untainted" by the immunized testimony.

Last, the potential for abuse by codefendants, coconspirators, friends, and employees in defense use immunity is substantial. As one court noted, granting use immunity to defense witnesses "could create opportunities for undermining the administration of justice by inviting cooperative perjury among law violators."

*Fox*, 491 N.W.2d at 533 (citations omitted).

**2. The prosecutorial misconduct theory.** In contrast to the almost universal rejec-tion of the effective defense theory, courts have held that the Due Process Clause does put some constraints on the State in its decision to grant or deny use immunity. Prosecutors violate a defendant's due process rights when they intentionally try to distort the factfinding process. In these circumstances, a court may "order the prosecutor to grant [use] immunity or face a judgment of acquittal." *Angiulo*, 897 F.2d at 1191–92.

A prosecutor can intentionally distort the factfinding process in two ways. First, prosecutors could intimidate or harass potential defense witnesses to discourage them from testifying. Such intimidation or harassment could come in the form of threats of prosecution for perjury. *Id.* If the threats cause the witness to invoke the Fifth Amendment and withhold testimony that would otherwise be available to the defendant, the court may order the prosecutor to grant the witness use immunity or face a judgment of acquittal. *Id.*

In *Fox*, we recognized this brand of prosecutorial misconduct. *Fox*, 491 N.W.2d at 532. We pointed out, however, that our prior holdings required an additional showing of prejudice to establish a due process violation. *Id.* And in determining whether prejudice has resulted from a prosecutor's intimidating tactics, we accorded trial courts broad discretion. *Id.*

The second way a prosecutor can intentionally distort the factfinding process is by deliberately withholding use immunity from prospective defense witnesses to keep exculpatory evidence from the jury. *Angiulo*, 897 F.2d at 1192.

## II. Analysis.

■ Simpson concedes the State did not intimidate or harass Caeser. Although Simpson contends the State's withholding of use immunity effectively prevented Caeser from presenting potentially exculpatory evidence, he stops short of saying the prosecutor did so for the express purpose of keeping exculpatory evidence from the jury. On our de novo review, we find no record evidence of such an intention. We therefore conclude Simpson has not established a due process

violation under the prosecutorial misconduct theory.

Simpson makes clear that he is actually relying on the effective defense theory to prove his alleged due process violation. Even were we to adopt this theory, we conclude Simpson has failed to make a threshold showing that the proffered testimony was *clearly* exculpatory. *Smith,* 615 F.2d at 972. At most and taken at face value, the proffered testimony merely implicates Caeser but does not exculpate Simpson of the crime for which he was charged. The common meaning of exculpate is to free one from a charge of guilt or fault. Webster's Encyclopedic Unabridged Dictionary of the English Language 676 (Deluxe ed. 1994).

The police found two pipes with crack cocaine burnt residue: one found under the floor mat in the passenger compartment of the vehicle and one thrown from Simpson's vehicle. Additionally, the police found "a couple of" push rods in the vehicle and eight to ten twist ends of baggies, scattered about in the vehicle. Testimony revealed that push rods are pieces of thin material that can be used to clean out a crack pipe and are usually found in the vicinity of crack pipes. Testimony also revealed that "baggies" are used to contain crack cocaine and twist ends are used to close the baggies.

The pipe found under the floor mat, the push rods, and the twist ends were more than enough to convict Simpson of possession of a controlled substance. So we cannot say that Caeser's proffered testimony was clearly exculpatory. *See United States v. Hardrich,* 707 F.2d 992, 994 (8th Cir.1983) (holding that where proffered testimony of two witnesses merely established incriminating evidence of a third party, but did not exonerate the defendant, district court did not err in refusing to grant use immunity to those witnesses who refused to testify without a grant of such immunity).

Moreover, we conclude no reasonable person would believe Caeser's proffered testimony. Rather than being "clearly exculpatory," such testimony borders on "cooperative perjury among law violators," a policy reason frequently cited for rejecting the effective defense theory.

### III. Conclusion.

Because Simpson did not make a threshold showing that Caeser's proffered testimony rose to the level of clearly exculpatory evidence, we conclude the district court did not violate Simpson's due process rights when it refused to grant Caeser use immunity.

**AFFIRMED.**