# IN THE COURT OF APPEALS OF IOWA

No. 4-042 / 13-0134
Filed April 16, 2014

**STATE OF IOWA,**
　　　　Plaintiff-Appellee,

**vs.**

**GABRIEL AVILA,**
　　　　Defendant-Appellant.
_____

　　　　Appeal from the Iowa District Court for Polk County, Michael D. Huppert (motion to suppress), Richard G. Blane II (jury trial), and Glenn E. Pille (sentencing), Judges.

　　　　A defendant appeals from the judgment and sentence following his convictions for various drug-related offenses. **AFFIRMED.**

　　　　Thomas J. Berg and Dustin M. Mueller of Berg, Rouse, Spaulding & Schmidt, P.L.C., Des Moines, for appellant.

　　　　Thomas J. Miller, Attorney General, Mary A. Triick, Assistant Attorney General, John P. Sarcone, County Attorney, and Stephan K. Bayens, Assistant County Attorney, for appellee.

　　　　Rita Bettis and Randall Wilson of ACLU of Iowa, Des Moines, for amicus curae American Civil Liberties Union of Iowa.

　　　　Heard by Vogel, P.J., and Doyle and Mullins, JJ.

**DOYLE, J.**

Gabriel Avila appeals from the judgment and sentence following his convictions for delivery of a controlled substance (methamphetamine), failure to possess a tax stamp, possession of a controlled substance (cocaine salt hydrochloride), and possession of a controlled substance (marijuana).  Avila contends the district court erred in (1) finding he voluntarily consented to the entry and search of his hotel room; (2) refusing to grant use immunity to compel the testimony of a proffered defense witness; (3) overruling his motion to suppress incriminating statements he made during a custodial interrogation; and (4) denying his requested jury instruction addressing the officers' failure to electronically record his custodial interrogation.  We affirm.

## I.    *Background Facts and Proceedings*

On or about April 27, 2012, law enforcement officers learned Alfonso Hinojoza-Duran would be traveling from Waterloo to Des Moines to purchase methamphetamine.  Officers identified Hinojoza-Duran's vehicle, obtained a warrant, and attached a GPS unit to the vehicle.  They conducted mobile surveillance on the vehicle as Hinojoza-Duran drove from Waterloo to Des Moines, made a brief stop at Econo Lodge, and then drove back to Waterloo.  Once Hinojoza-Duran reentered Black Hawk County, officers initiated a preplanned traffic stop.  A search of his vehicle revealed more than ten grams of methamphetamine.

Meanwhile, officers conducted surveillance on room 252 at Econo Lodge, the hotel room Hinojoza-Duran had been seen exiting.  They observed a woman later identified as Sarah Smith and her young child enter the room.  A short time

later, a man later identified as defendant Gabriel Avila left the room while speaking on his phone. Avila walked toward the officers conducting surveillance, looked at them, and immediately turned around and went back into his room.

By this point, approximately an hour and a half had passed since Hinojoza-Duran left room 252 and his vehicle had not yet been stopped in Waterloo. Des Moines officers had originally planned to obtain a warrant to search Avila's room once drugs were discovered in Hinojoza-Duran's vehicle in Waterloo. However, when it became apparent to the Des Moines officers "someone knew something was up," they felt they needed to take some sort of action.

To avoid compromising other aspects of the investigation, officers decided the best course of action was to perform a "knock and talk"[1] encounter with Avila. Special Agent Austin knocked on Avila's door and asked him to open it. After some "back and forth" conversation with Avila, Agent Austin identified himself as a police officer and told Avila the officers wanted to speak with him about a drug investigation. At Avila's request, Agent Austin held his police badge to the peep hole of the door to identify himself. Avila stated he was in the shower and needed to put on clothes. Around this time, Agent Austin received a phone call from a Waterloo officer confirming Hinojoza-Duran had been stopped and methamphetamine had been discovered inside the vehicle.

---

[1] In general, the "knock and talk" procedure involves officers knocking on the door, identifying themselves, asking to talk to the occupant about a criminal matter, and eventually requesting permission to search the premises. *See State v. Lowe*, 812 N.W.2d 554, 573 (Iowa 2012) (describing "knock and talk" investigative procedure). If no consent was given, the officers walk away; if consent is given, the procedure allows officers lacking probable cause to gain access and conduct a search. *See id.*

Avila opened the door, and Agent Austin asked if the officers could enter the room and speak to him regarding a drug investigation. The four officers were wearing plain clothes and were armed, but their weapons were concealed. Avila stepped back from the door and responded, "Yes. Come in." Agent Austin asked Avila if he had any weapons on him; Avila responded he did not. Agent Austin asked Avila if he could pat down the outer parts of his clothing for weapons, and Avila held his hands out and allowed the pat down.

Agent Austin advised Avila that narcotics had been located in a vehicle that had been seen originating from his hotel room. Agent Austin questioned Avila whether there were any large amounts of money, weapons, or drugs in the room. Avila responded there was not. Agent Austin asked if he could search the room, and Avila responded, "No problem. Go ahead and search." Around this time, an officer escorted Sarah Smith and her young child out of the room.

Several officers searched the room while Special Agent Bassett continued to speak to Avila. Avila was sitting on the couch, and Agent Bassett sat down next to him. The officers told Avila several times he could tell them to leave at any time. Avila was free to move around the room and smoked a cigarette during the search.

During the course of the search, officers found $3700 cash, a white powdery substance (later identified as cocaine) in a cellophane bag in a cabinet, and suspected drug notes on a notepad. Officers also requested and were granted permission to search Avila's truck. A small amount of marijuana was found in the truck.

At this point, Avila was arrested and placed in formal custody. Officers handcuffed him and transported him to the Polk County Jail.

Over the next few days, Agent Austin learned Avila had been working as an informant for the Department of Homeland Security out of Kansas City. A Homeland Security agent contacted Agent Austin and told Agent Austin that Avila wished to cooperate with Iowa law enforcement and requested Iowa agents come speak with him at the Polk County Jail.

On May 1, 2012, Agent Austin and Agent Bassett drove to the Polk County Jail to meet with Avila. Upon arrival, Agent Austin read Avila his *Miranda* rights from a department-issued card. Avila stated he understood his rights and that he wanted to talk to the officers about possibly cooperating so he could get out of jail. Avila proceeded to provide the officers with information and names of his suppliers in Texas and Kansas City.

The interview was not electronically recorded. Agent Austin explained his general practice is to record all custodial interrogations but that he does not record interviews in which he is "gathering narcotics intelligence information." Agent Austin explained he does not record those conversations "for safety reasons," believing a potential informant would not want to be recorded revealing names of those above him in the chain of narcotics distribution.

The State subsequently filed a four-count trial information charging Avila with delivery of a controlled substance (methamphetamine), failure to possess a tax stamp, possession of a controlled substance (cocaine salt hydrochloride), and possession of a controlled substance (marijuana). Avila filed a motion to suppress the evidence, claiming he did not consent to the officers' entry or

search of the hotel room and vehicle. Avila also requested suppression of the incriminating statements he made on April 27 in the hotel room and May 1 at the Polk County Jail, claiming the statements were made in violation of *Miranda* requirements.

At the hearing on Avila's motion to suppress, the court received testimony from three officers and Avila, and was presented with two different versions of the facts. The court determined Avila's testimony was not credible.

The court denied the motion in part, concluding the officers' testimony established by a preponderance of the evidence Avila "voluntarily consented to both the officers' entry into his hotel room and the search of that room and his vehicle." The court granted the motion in part, concluding any statements made by Avila after he was confronted with the evidence found during the search were received in violation of Avila's *Miranda* rights and were inadmissible. The court determined, however, Avila's statements to officers on May 1 at the Polk County Jail after Avila waived his *Miranda* rights were admissible.[2] The court denied Avila's requests to compel the testimony of Sarah Smith, who invoked her right against self-incrimination.

The case proceeded to trial, and the jury found Avila guilty as charged. Avila appeals.

## II.    *Standards of Review*

To the extent Avila raises claims that are constitutional in nature, we review those claims de novo. *See State v. Reinier*, 628 N.W.2d 460, 464 (Iowa

---

[2] Avila later filed another motion to suppress his statements made to officers on May 1, which the court denied.

2001). Though our review is de novo, we give deference to the trial court due to its opportunity to evaluate the credibility of the witnesses. *Id.*

In general, we review challenges to jury instructions for correction of errors at law. *See State v. Frei*, 831 N.W.2d 70, 73 (Iowa 2013); *see also* Iowa R. App. P. 6.907. We review the related claim that the trial court should have given Avila's requested instruction for an abuse of discretion. *See id.*

### III. Entry and Search of the Hotel Room

Avila contends the district court erred in finding he consented to the officers' entry and search of his hotel room. Avila's consent was obtained after a "knock and talk" encounter with the officers.

In *Reinier*, 628 N.W.2d at 466, the Iowa Supreme Court discussed a "knock and talk" encounter at the defendant's residence:

> In this case, we begin our analysis of the surrounding circumstances by considering the general investigative procedure utilized by the police which culminated in the consent given by Reinier to search her house. This procedure was characterized by police as a "knock and talk" investigation, which involves officers knocking on the door of a house, identifying themselves as officers, asking to talk to the occupant about a criminal complaint, and eventually requesting permission to search the house. If successful, it allows police officers who lack probable cause to gain access to a house and conduct a search.

(Internal citation omitted.) The Fourth Amendment and article I, section 8 of the Iowa Constitution are implicated when police intrude upon a person's legitimate expectation of privacy. *Reiner*, 628 N.W.2d at 466. Neither party asserts Avila lacked an expectation of privacy in his hotel room. "Thus, entry into the area by police constituted a search under the Fourth Amendment, and we must

determine if consent was given to enter the [hotel room] based on the manner [Avila] opened the door after the officers knocked on it." *See id.* at 467.

Consent may be given by non-verbal conduct, which can include opening a door under certain circumstances. *See id.* We look to the specific circumstances surrounding the "knock and talk" procedure in evaluating the totality of the circumstances surrounding the consent. *See id.*

At the hearing on Avila's motion to suppress, the court was presented with two different versions of the facts. The first, presented by the State's witnesses, was that the officers knocked on the hotel room door, announced who they were, and requested Avila's permission to enter so they could talk about an ongoing drug investigation; after a short time Avila opened the door, stepped back from the doorway, and allowed them to enter. The second version, presented by Avila, was that the officers ordered him to open the door so they could check on the safety of the child in the hotel room; when he opened the door, all the officers came in, started searching the room, pushed Avila to the bed, showed their guns, and told Avila not to "be stupid" because they had guns. Both versions had points of weakness, which were explored during the cross-examination of the witnesses. In ruling on the motion, the court stated:

> The two versions of events established by these competing testimonies could not be more diametrically opposed. This requires the court to resolve the credibility issues raised by these versions. In arguing that his version should prevail, the defendant focuses primarily on the internal inconsistencies among the officers' testimony. On the other hand, the State focuses on the defendant's interest in presenting a version that will result in his motion being granted (and perhaps the dismissal of charges against him). Having heard the testimony of the witnesses and observed their demeanor during the hearing, the court concludes that the testimony of the defendant is wholly without credibility. For the

court to accept the defendant's version of events, it would have to conclude that law enforcement not only acted in a completely unprofessional fashion, but also entirely fabricated the very statement attributed to the defendant that he now seeks to suppress. This is more telling to the court than merely the defendant's self-interest, which would always be present when a defendant seeks the suppression of the State's evidence. While the court acknowledges some minor inconsistencies in the officers' testimonies, these variations can be explained by the quickness with which events unfolded on the dates in question and the passage of time since.

Ultimately, the court deemed the three officers' testimony more credible than Avila's. We give deference to this determination, based on the trial court's opportunity to observe the witnesses as they testified. *See id.* at 464; *see also State v. Hatter*, 342 N.W.2d 851, 854 (Iowa 1983) ("In recognition of the trial court's ability to observe the witnesses while they were testifying and thus better judge their credibility, we will in this case grant the trial courts' findings of fact considerable deference.").

The officers testified they knocked and announced both who they were and their purpose, and in response Avila opened the door, stepped to the side, and allowed the officers to enter. This can be contrasted with *Reinier*, in which the court found there was no consent for entry into a suspect's porch where police were unable to recall whether they identified themselves or announced their purpose before stepping into the porch area. 628 N.W.2d at 467. As the *Reinier* court noted:

> The officers in this case could not recall if they actually engaged in any conversation with Reinier before they stepped onto the porch, but felt she invited them into the porch because it was cold outside and she opened the door wide in response to their knock. The officers acknowledged they did not identify themselves as police officers or announce their business before stepping onto the porch.

The act of opening a door in response to a knock could under certain circumstances constitute consent. However, the officers in this case were unable to recall the specific details of the event that would support a finding of consent. The State carried the burden of proof on this issue, and the evidence was insufficient to objectively show Reinier consented by opening the door. In fact, the officers acknowledged Reinier appeared surprised when they entered the porch without an oral request. This reaction was understandable and does not support consent.

*Id.* (internal citations omitted).

Here, the more credible evidence was that the officers identified themselves and their purpose before Avila stepped to the side and allowed them in the room. *Cf. id.* The State carried its burden to prove the officers had consent to enter the hotel room. *See Lowe*, 812 N.W.2d at 573 ("The State carries the burden of proving there was valid consent both to enter the home and to conduct the search.").

Avila claims even if we conclude he consented to the officers' entry and search the hotel room, "the consent was not voluntary." Whether consent is voluntary is a question of fact determined from the totality of the circumstances. *State v. Lane*, 726 N.W.2d 371, 378 (Iowa 2007). In determining the validity of the consent given we look to the personal characteristics of the defendant and the context of the consent.[3] *See id.*; *Reinier*, 628 N.W.2d at 465-66.

---

[3] In determining whether consent is voluntary, courts examine the totality of the circumstances, including relevant factors such as:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether police made promises or misrepresentations; (4) whether the individual was in custody

Considering the totality of the circumstances, we conclude Avila's consent to enter and search was voluntary. After initially being asked to consent to the officers' entry to speak with him about a drug investigation, the officers repeatedly told Avila he was free to leave and free to request that the officers leave. Avila consented to the search, telling the officers, "No problem. Go ahead and search." Avila also consented to a pat down search, which was limited to the outside of his clothing. The encounter took place in the familiar surroundings of his hotel room. *Cf. State v. Pals*, 805 N.W.2d 767, 782 (Iowa 2011) (observing the defendant was never told he was free to leave, the officer subjected the defendant to a pat-down search, and the defendant was detained in the police vehicle at the time of the consent to search). Avila was an employed adult, who had been living in the United States for twenty years, and stated he was not under the influence of drugs or alcohol. Avila's prior experience with law enforcement indicates he had some understanding he could refuse the officers' requests. We affirm on this issue.

## IV.    *Use Immunity*

Avila contends the district court violated his constitutional rights when it refused to grant use immunity to his proffered witness, Sarah Smith. Smith exercised her right against self-incrimination and refused to testify.

Prior to trial, Avila filed several motions to compel the testimony of Smith, claiming her testimony was pertinent to the issue of whether consent was given

---

or under arrest when consent was given; (5) whether consent was given in a public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*Lowe*, 812 N.W.2d at 572-73; *see also Reinier*, 628 N.W.2d at 465-66.

to officers to enter and search his hotel room. Several hearings were held on the matter. The district court initially ruled to allow Smith "to answer a strictly-defined line of questions regarding her observations at the hotel room on April 27 relative to the issue of consent." The court later reconsidered its ruling, allowed Smith to invoke her Fifth Amendment right against self-incrimination, and denied Avila's request to compel her testimony, concluding "even this limited line of inquiry could place Ms. Smith at risk of prosecution based on her responses."

Use immunity is a court order compelling a witness to give self-incriminating testimony and prohibiting the State from using the testimony in a subsequent prosecution of the witness. *State v. Fox*, 491 N.W.2d 527, 533 (Iowa 1992). The Iowa Supreme Court has not yet recognized whether the district courts in this state have the inherent power to grant use immunity, but it has found the district courts have no statutory authority to grant immunity on its own motion. *Id.*

Several policy reasons weigh against allowing the court to grant use immunity including: the risk the judicial branch will encroach on the decisions traditionally made by the executive branch, the risk of significantly impairing the State's ability to prosecute immunized witnesses and increasing the State's burden of proof, and the risk of abuse by codefendants by undermining the administration of justice through cooperative perjury. *See id.* Although the court in *Fox* found it did not need to decide whether the district court had the inherent power to grant use immunity, it did state "use immunity—if available at all— should be considered only in circumstances in which the prosecution has

improperly prevented a defense witness from giving essential exculpatory evidence." *Id.* at 533-34.

If Smith was granted immunity, Avila asserts she would testify the officers did not have consent to enter and search his hotel room. According to Avila, Smith's testimony would confirm "his story." Avila points out that other than himself, Smith was "the only other non-law enforcement adult who witnessed the actions" of the officers on April 27, 2012.

The Iowa Supreme Court has acknowledged "two emerging theories" that have been recognized by some courts as requiring use immunity. *State v. Simpson*, 587 N.W.2d 770, 772 (Iowa 1998) (citing *United States v. Angiulo*, 897 F.2d 1169, 1190 (1st Cir. 1990)). Under the "prosecutorial misconduct theory," the court may order immunity to a witness if it determines the State is "intentionally trying to distort the factfinding process." *See id.* at 773. A prosecutor can intentionally distort the factfinding process by "intimidat[ing] or harass[ing] potential defense witnesses to discourage them from testifying" or by "deliberately withholding use immunity from prospective defense witnesses to keep exculpatory evidence from the jury." *See id.*

Here, there is no evidence of intimidation or harassment of Smith or that the State deliberately withheld Smith's testimony to keep exculpatory evidence from trial. Smith was informed the State would cross-examine her regarding her testimony and credibility if she took the stand. Such action, however, does not constitute prosecutorial misconduct.[4] *See, e.g.*, *State v. Peterson*, 532 N.W.2d

---

[4] Even assuming, *arguendo*, Smith was intimidated, Avila has not shown he was prejudiced by the alleged misconduct. *State v. Anderson*, 448 N.W.2d 32, 33 (Iowa

813, 817 (Iowa Ct. App. 1995) ("[W]hen the prosecutor or the trial judge has told a prospective defense witness he *could* face prosecution if he testified, a majority of courts have found that no misconduct occurred.").

Under the "effective defense theory," the court may order immunity to a witness "whose testimony is essential to an effective defense." *Simpson*, 587 N.W.2d at 772. "[O]nly a small minority of cases" have embraced this theory. *See id.* It requires the defendant to make a threshold showing the proffered testimony was both "essential" and "*clearly* exculpatory." *Id.* at 774. In this vein, "[i]mmunity will be denied if the proffered testimony is found to be ambiguous, not clearly exculpatory, cumulative or if it is found to relate only to the credibility of the government's witnesses." *Id.* at 772 (quoting *Government of the Virgin Islands v. Smith*, 615 F.2d 964, 962 (3rd Cir. 1980)). If the defendant can convince the court the testimony is both clearly exculpatory and essential, the focus then shifts to consideration of the State's countervailing interests, including prosecution of the witness the defendant seeks to immunize. *See id.* at 772-73.

Here, the evidence Avila sought to offer was neither essential nor clearly exculpatory. The evidence was available through Avila's own testimony as well as through a jail call recording of his conversation with Smith,[5] and therefore

---

1989) ("Trial courts are vested with broad authority to determine whether prejudice actually results from misconduct."); *Peterson*, 532 N.W.2d at 819 ("Even when the defendant has shown that the prosecutor improperly intimidated a defense witness, our supreme court has declined to grant relief unless the defendant also establishes that he suffered prejudice.").

[5] Smith spoke on the phone to Avila on May 1, 2012, and told him, "They had no right to search your house. There was no warrant, there was no probable cause, and nobody consented to a search. It was an illegal search and seizure and I don't know what the hell they think they're doing. They think they can do whatever they want to do, and they can't." Smith also told Avila, "You're gonna walk on the charges," "gonna beat these charges," "not a question about it."

would have been cumulative of other evidence. *See id.* at 772. Further, we do not believe a reasonable person would believe Smith's proffered testimony where it borders on "cooperative perjury among law violators," a policy reason frequently cited for rejecting the effective defense theory. *See id.* at 774. Under these circumstances, we conclude the district court did not violate Avila's due process rights when it refused to grant Smith use immunity. We affirm on this issue.

## V. *Admissibility of Statements Made During the Custodial Interrogation*

Avila and amicus curiae contend electronic recording of custodial interrogations should be required when feasible, and any statements made where police have failed to record the interrogation should be excluded.[6] In this case, Agent Austin and Agent Bassett conducted the custodial interrogation of Avila on May 1 at the Polk County Jail. The interview was not recorded even though agents acknowledged it was their standard procedure to videotape custodial interrogations and electronic recording equipment was available at the jail. Avila made incriminating statements during the interview. Avila and amicus curiae claim Avila's statements on May 1 should be excluded.

According to Avila and amicus curiae, this case presents us with an opportunity to establish a rule requiring electronic recording of custodial interrogations. The Iowa Supreme Court has declined to take this step. *See*

---

[6] Insofar as Avila contends his statements should be suppressed because they were not recorded, the State argues Avila failed to preserve error on this claim where it was not raised and decided by the district court. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) (observing that an issue is preserved for review if it has been raised and decided by the district court). We elect to bypass this error preservation concern and proceed to the merits of this issue. *See State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999) (bypassing error preservation problem and proceeding to the merits of the appeal).

*State v. Hajtic*, 724 N.W.2d 449, 454-56 (Iowa 2006) (encouraging, but not requiring, electronic recording of custodial interrogations) *see also State v. Madsen*, 813 N.W.2d 714, 721 (Iowa 2012) ("We did not say in [*Hajtic*] that unrecorded confessions were inadmissible, and we decline Madsen's invitation to take that step now."); *State v. Morgan*, 559 N.W.2d 603, 609 (Iowa 1997) ("Requiring law enforcement personnel to record interrogations or to ask such clarifying questions are issues that may be argued both pro and con as matters of public policy. We are confident, however, that such procedures are in no way mandated by any provision in the Iowa Constitution.").

In light of this case law and the absence of an Iowa statute addressing this issue, we decline Avila's invitation.[7] *See, e.g.*, *State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990) ("We are not at liberty to overturn Iowa Supreme Court precedent."); *State v. Cook*, 847 A.2d 530, 546-47 (N.J. 2004) (noting the considerations regarding electronic recording "are important and nuanced, and should be addressed in a context broader than that permitted in any one criminal appeal"); *State v. Gorton*, 548 A.2d 419, 422 (Vt. 1988) ("In the absence of

---

[7] In any event, under these circumstances, we do not believe the fact the interview was not recorded was of an egregious or suspicious nature so as to require suppression of Avila's statements. Indeed, Avila's May 1 interview was prompted by Avila's own request to meet with Agent Austin and Agent Bassett at the jail. Agent Austin stated he read Avila his *Miranda* rights from a department-issued card when the officers arrived; Avila stated he understood his rights and that he wanted to talk to the officers about possibly cooperating so he could get out of jail. Moreover, although Agent Austin stated his general practice is to record all custodial interrogations, he explained he does not record interviews in which he is gathering narcotics intelligence information for safety reasons (*i.e.*, because a potential informant would not want to be recorded revealing names of those above in the chain of narcotics distribution). We conclude the failure to electronically record Avila's May 1 interview does not render his statements inadmissible.

legislation, we do not believe it appropriate to require, by judicial fiat, that all statements taken of a person in custody be tape-recorded.").

Avila also contends his May 1 statements "were tainted by prior illegality." Specifically, Avila claims because the officers obtained incriminating statements from him on April 27 without a *Miranda* warning, which were suppressed by the district court, his "nearly identical" statements on May 1—even assuming a *Miranda* warning was given—should have also been suppressed. "'[A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.'" *Irving v. State*, 533 N.W.2d 538, 542 (Iowa 1995) (quoting *Oregon v. Elstad*, 470 U.S. 298, 318 (1985)). Under the facts of this case, we conclude Avila's post-*Miranda* statements were admissible.

## VI. *Cautionary Jury Instruction*

In the alternative, Avila and amicus curiae contend the district court should have issued a cautionary jury instruction to remedy the noncompliance with electronic recording.

At the close of trial, Avila requested a jury instruction stating, "Law enforcement is encouraged to use electronic recording, particularly videotaping, of custodial interrogations. That was not done in this case. You're entitled to consider law enforcement's failure to use electronic recording when evaluating the evidence and credibilities in this case." The district court declined to include this instruction. The court noted that jury instruction fifteen, subparagraph five, embodied the same legal concepts:

In this case, the State has presented evidence that the Defendant made admissions that he committed one or more of the crimes charged. This is referred to as a confession.

In determining the weight and believability of the confession, you may consider:

1. Defendant's mental capacity and intelligence.

2. Defendant's mental and emotional state at the time it was made.

3. Whether it was knowingly and intelligently made.

4. Whether the Defendant understood his statement to be an admission.

5. Whether the Defendant's statement was recorded.

6. Any other evidence relating to the confession.

The district court further noted its concern of the applicability of *Hajtic* to Avila's case in light of the fact that Avila had initiated the conversation with the officers, and by all accounts, Avila was prepared to offer cooperative information to the officers. Upon our review, we conclude the court gave instructions that "fairly state[d] the law as applied to the facts of the case," *see State v. Marin*, 788 N.W.2d 833, 838 (Iowa 2010), and no abuse of discretion occurred.

## VII.    *Conclusion*

Upon our review of the issues raised by Avila, we affirm his judgment and sentence for delivery of a controlled substance (methamphetamine), failure to possess a tax stamp, possession of a controlled substance (cocaine salt hydrochloride), and possession of a controlled substance (marijuana).

**AFFIRMED.**