# IN THE COURT OF APPEALS OF IOWA

No. 21-1320
Filed December 7, 2022

**STATE OF IOWA,**
   Plaintiff-Appellee,

**vs.**

**MAURICE SYLVESTER GREEN,**
   Defendant-Appellant.
_____

   Appeal from the Iowa District Court for Polk County, Becky Goettsch (motion to consolidate), Brendan E. Greiner (motion to suppress), and Jesse Ramirez (motion to sever, trial, and sentencing), District Associate Judges.

   Maurice Green appeals his two convictions for operating while under the influence. **AFFIRMED.**

   Martha J. Lucey, State Appellate Defender, and Ashley Stewart, Assistant Appellate Defender, for appellant.

   Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.

   Considered by Tabor, P.J., Ahlers, J., and Scott, S.J.*

   *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2022).

**SCOTT, Senior Judge.**

Maurice Green appeals his two convictions for operating while intoxicated (OWI).  He challenges the denial of his motion to suppress, contending he was subjected to two unreasonable seizures within less than three hours.  He also asserts the trial court abused its discretion in consolidating the two OWI cases.  We affirm.

**I. Background Facts.**

On May 11, 2021, Officer Robert Garcia was dispatched to a report about a vehicle parked on the street with its lights on since 3:30 a.m.  At 5:26 a.m., Officer Garcia approached a 2003 maroon Buick Le Sabre; the engine was running and music was playing.  Officer Garcia saw a man in the driver's seat who was asleep or unconscious and holding a cell phone and his wallet.  Officer Garcia knocked on the window but the man did not respond.  Officer Garcia opened the unlocked driver's door and shook the man's shoulder.  Again, the man did not respond.  Officer Garcia then rubbed the man's sternum for some thirty seconds.[1]  Officer Garcia testified at the hearing on the motion to suppress,

> One of the first things is I was able to detect an odor of an alcohol emitting from the vehicle.  When he eventually woke up, his eyes were bloodshot.  They were watery.  He was definitely dazed and confused.  He did not know where he was located. . . .  Just talking to him, trying to ask questions, just a lot of delayed responses or no responses at all.
> . . . .
> And he got to the point where when I asked him for identification, he was willing to provide his ID.  He handed out a couple different credit cards before he was able to pull out his ID.
> Q. So at this point did you decide to do any further investigation?  A. At this point I feel like I had enough reason to

---

[1] Officer Garcia testified a sternum rub involves using one's knuckles to rub the person's sternum, which is "uncomfortable and kind of painful."

believe that there will be a possible OWI investigation. At first it was, let's get the driver out. Let's make sure he's okay. And then when I started observing all these clues, it was, we need to move on further in this investigation.

Officer Garcia learned the man's name was Green. A horizontal gaze nystagmus test produced six of six "clues" of impairment. Green was so unsteady on his feet the officer did not attempt to perform additional field sobriety tests but offered a preliminary breath test. Green refused. The officer placed him in custody and transported him to the police station. Green again refused a breath test, and Officer Garcia invoked implied consent.[2] Green was booked for OWI, issued a citation, and released to a sober driver. Records indicate Green was released at 7:46 a.m.

Officer Garcia's shift ended and he left the station about 8:00 a.m. As he was leaving the station parking lot, he noticed a red sedan—the 2003 Le Sabre—being driven by just-released Green. Officer Garcia was driving behind Green in

---

[2] Pursuant to Iowa Code section 321J.6(1) (2021), a person who operates a vehicle in Iowa "is deemed to have given consent" to be tested "for the purpose of determining the alcohol concentration or presence of a controlled substance or other drugs." "Refusal to submit to a chemical test of urine or breath is deemed a refusal to submit, and section 321J.9 applies." Iowa Code § 321J.6(2).

Pursuant to section 321J.9,

1. If a person refuses to submit to the chemical testing, a test shall not be given, but the department, upon the receipt of the peace officer's certification, subject to penalty for perjury, that the officer had reasonable grounds to believe the person to have been operating a motor vehicle in violation of section 321J.2 or 321J.2A, that specified conditions existed for chemical testing pursuant to section 321J.6, and that the person refused to submit to the chemical testing, shall revoke the person's driver's license and any nonresident operating privilege for the following periods of time . . . .

. . . .

4. The effective date of revocation shall be ten days after the department has mailed notice of revocation to the person by first class mail . . . .

his personal vehicle. He called dispatch and reported Green, after recently being released from custody for OWI, was swerving and driving in excess of the posted speed limit.

Officer Lee Gebhardt responded to a dispatch report that off-duty Officer Garcia was following a car driven by Green who had just been released from jail and should not be driving and that Officer Garcia noticed that Green was speeding, swerving on the roadway, and showing signs of impairment. Officer Gebhardt located and stopped Green's vehicle at 8:06 a.m. The officer stated:

> First, when I initially saw him[,] he was holding the evidence bag, and he was kind of mumbling and speaking about that before I really said a whole lot about anything. When he looked up at me, I could tell his eyes were still bloodshot and watery. His speech was slow and slurred. His movements throughout the car were slow, not a normal person's behavior.

Officer Gebhardt completed an OWI investigation and charged Green with OWI.

Two separate trial informations were filed charging Green with OWI. The State later moved to consolidate the cases, which the court allowed over Green's objection. An amended trial information charged Green with two counts of OWI.

Green moved to suppress evidence on claims the 5:29 a.m. seizure was based on an anonymous tip, Officer Garcia did not have reasonable suspicion a crime was afoot, and the officer committed a physical trespass into the vehicle. The State's response was that there was no stop or seizure, the interaction was valid under the officer's community caretaking responsibilities, and once Green was responsive, the officer had reasonable suspicion he was operating while intoxicated.

Concerning the 8:06 a.m. stop, Green contended Officer Garcia reported only that Green was speeding and he believed the driver was impaired, Officer Gebhardt observed no traffic violations, and he did not have reasonable suspicion to stop Green. The State resisted, noting Officer Garcia's observations provided reasonable suspicion upon which Officer Gebhardt could rely.

At the hearing on the motion to suppress, Officer Garcia's bodycam footage of the encounter and the original 911 call were admitted, and Officers Garcia and Gebhardt testified. The court issued its ruling denying the motion from the bench. The court found that during the first encounter Officer Garcia was engaged in a "bona fide community caretaking activity" when he responded to Green's vehicle parked outside a 911 caller's house for approximately two hours with its lights on, and "when [Officer Garcia] approached the vehicle, knocking on the window, [Green] was unresponsive." After eventually reviving Green, the officer had reasonable suspicion he was operating while intoxicated.

With respect to the second encounter, the court ruled the stop was based on "probable cause to believe criminal activity was occurring in the presence of the police officers at the time that this stop was initiated." Specifically, the court found "Officer Garcia witnessed speeding by [Green], observed [Green] driving while revoked in violation of Iowa Code section 321J.9, and observed possible operating while intoxicated because [Green fifteen] minutes prior was just released to a sober driver."

At trial, Officers Garcia and Gebhardt testified about their respective encounters with Green. Both officers' bodycam recordings were admitted, as was Officer Gebhardt's backup officer's bodycam footage of Green performing field

sobriety testing, and camera footage of Green being transported in the back seat Officer Gebhardt's police vehicle. The jury found Green guilty on both counts of OWI, and the court imposed consecutive sentences, with all but fourteen days suspended, and placed Green on one year of probation.

Green appeals, challenging the denial of his motion to suppress and the consolidation of the two OWI cases.

## II. Scope and Standard of Review.

"When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." *State v. Smith*, 919 N.W.2d 1, 4 (Iowa 2018) (citation omitted). "We view the entire record and make an independent evaluation of the totality of the circumstances." *Id.* (internal quotation marks and citation omitted).

We review consolidation and severance issues for an abuse of discretion. *See State v. Romer*, 832 N.W.2d 169, 181 (Iowa 2013). "An abuse of discretion will be found only when a court acts on grounds clearly untenable or to an extent clearly unreasonable." *State v. Oliver*, 588 N.W.2d 412, 414 (Iowa 1998).

## III. Discussion.

*5:29 a.m. interaction.* The trial court concluded the officer "was engaged in a community caretaking function when he opened the car door and attempted to check on the safety of and the condition of [Green]."

> The community caretaking exception to the warrant requirement, recognized by the United States Supreme Court in *Cady v. Dombrowski*, is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. 433, 441 (1973). This exception "involves

the duty of police officers to help citizens an officer reasonably believes may be in need of assistance."

*State v. Coffman*, 914 N.W.2d 240, 244 (Iowa 2018) (Iowa case citations omitted). "Under article I, section 8 [of the Iowa Constitution], . . . it is incumbent on the state to prove *both* that the objective facts satisfy the standards for community caretaking *and* that the officer subjectively intended to engage in community caretaking." *Id.* at 257. In applying the caretaking exception, courts ask the following questions: "(1) was there a seizure within the meaning of the Fourth Amendment?; (2) if so, was the police conduct bona fide community caretaker activity?; and (3) if so, did the public need and interest outweigh the intrusion upon the privacy of the citizen?" *Id.* at 245 (citation omitted). We assess each community caretaking case "according to its own unique set of facts and circumstances." *Id.* (citation omitted).

On appeal, Green asserts he was seized when Officer Garcia stood in his car's doorway and opened the unlocked door. Though he was unconscious at that time, he maintains a reasonable person under those circumstances "would not feel free to disregard the police and go about his business." *See State v.* Lowe, 812 N.W.2d 554, 570 (Iowa 2012). Green bears the burden to show a seizure occurred. *See State v. Fogg*, 936 N.W.2d 664, 668 (Iowa 2019).

The State argues Green was not seized until he became conscious, at which time Officer Garcia had reasonable suspicion to begin the OWI investigation. We agree. In a case with very similar facts, this court found no seizure occurred until the occupant of a parked vehicle was roused and complied with officer's directions:

An officer at 11:30 p.m. observed a car with its lights on in a parking lot of a closed business. When the officer pulled into the lot, the officer saw a male in a reclined driver's seat and a car running with its lights on. He approached the parked vehicle. The occupant did not stir. As observed in [*State v.*] *Wilkes*, "[t]he officer, like any other citizen, has a right to look into the car. As a result, no seizure occurred when the officer merely approached [the defendant's] parked vehicle." 756 N.W.2d [838,] 844 [(Iowa 2008)].

. . . .

We know from *Wilkes*, 756 N.W.2d at 844, that parking behind a parked vehicle without blocking the defendant's vehicle is not a seizure. We also know that an officer who uses his emergency lights and blocks a vehicle while attempting to investigate an individual in a parked car to address an alleged caretaking function will constitute a seizure—at least if the stopped individual is conscious. *See* [*State v.*] *Kurth*, 813 N.W.2d [270,] 277 [(Iowa 2012)].

While [*State v.*] *Harlan*, does state that a display of flashing lights "might also constitute a show of authority that is a seizure," 301 N.W.2d [717,] 720 [(Iowa 1981)], under the totality of the circumstances presented here, Deputy Barber did not restrain Ivankovic's liberty in any way prior to rousing him. A submission to a "show of authority" is required for a seizure to occur. *California v. Hodari D.*, 499 U.S. 621, 627–29 (1991) (holding that seizure of fleeing suspect did not occur because seizure requires the show of authority and submission to authority). The cases cited by the district court from other jurisdictions are in accordance with this principle. . . .

At the earliest here, any seizure occurred when the officer directed Ivankovic to shut off the ignition and removed his seat belt, with which Ivankovic complied. But by this time, the officer had reasonable suspicion to believe Ivankovic was operating his motor vehicle while intoxicated.

*State v. Ivankovic*, No. 15-0622, 2016 WL 3269627, at *3–4 (Iowa Ct. App. June 15, 2016) (second and third alterations in original).

Even if we presume a seizure occurred when the officer opened the car door and attempted to check on Green's safety, we agree with the trial court that the officer was engaged in a community caretaking function and exempted from the warrant requirement.

"Clearly, a community caretaking seizure of a motorist must be supported by objective grounds to believe the motorist or a third party affected by the motorist *may* need assistance." *Coffman*, 914 N.W.2d at 257.

> In applying the Fourth Amendment, we have said that "the relevant test for determining whether the community caretaking exception applies is an objective one based on the information available at the time of the stop and does not depend upon the subjective motivations of the individual officers involved." Under article I, section 8 [of the Iowa Constitution], though, we believe it is incumbent on the state to prove *both* that the objective facts satisfy the standards for community caretaking *and* that the officer subjectively intended to engage in community caretaking.

*Id.* (internal citations omitted).[3]

Green argues Officer Garcia was *not* engaged in a community caretaking because there was no outward sign of distress or that Green's "well-being was compromised." Green notes it is not illegal to sleep in a parked car. And Officer Garcia testified he went to investigate a suspicious vehicle parked on the side of the road. Green believes his position is supported by *Smith* where our supreme court concluded the officer was not engaged in a bona fide act of community caretaking. 919 N.W.2d at 5. We find *Smith* distinguishable on its facts.

> At approximately 4:30 a.m. on Saturday, April 2, 2016, sheriff's deputies were called to the scene of a single-vehicle accident in Clarke County. Dispatch informed Deputies Smith and Fitzpatrick that the vehicle was in a roadside ditch. Dispatch also relayed that a passerby had seen a possible driver walking away from the vehicle and had not seen any injuries.

---

[3] Generally, if a defendant relying on the state constitution "does not advance a distinct analytical framework under the Iowa Constitution" in claiming an unreasonable search and seizure, we will "apply the federal framework applied to claims under the Fourth Amendment to the United States Constitution in considering his state constitutional claim." *See State v. Baker*, 925 N.W.2d 602, 610 (Iowa 2019). Green cites *Coffman*, 914 N.W.2d at 245–57, in arguing Officer Garcia did not subjectively intend to engage in community caretaking.

After arriving at the scene, Deputy Fitzpatrick ran a check on the license plate of the vehicle in the ditch and determined it belonged to a Steven Smith with an Osceola address. Deputy Smith drove around in search of the individual who had been seen walking from the accident. Not finding anyone, he reparked his patrol car next to the vehicle in the ditch. On the front seat of that vehicle, he found a Minnesota driver's license belonging to the defendant, Cody Smith. There was no indication inside the vehicle that Cody had been injured.

Meanwhile, a van drove by. It pulled into the driveway of a nearby residence, pulled back out of the driveway, and departed. Officer Smith ran a check on the van's license plate and determined it belonged to a Noreen Smith, who shared the same Osceola address as Steven.

*Id.* at 2 (footnote omitted). The officer then followed the van and pulled it over. *Id.* at 3. When asked why he stopped the van, he testified he found it suspicious that the vehicle driving by and the vehicle in the ditch had the same address. *Id.*

The supreme court explained why it found the officer was not engaged in a bona fide community caretaking activity:

A vehicle that veers into a roadside ditch at 4:30 a.m. on a weekend is often the result of impaired driving. Given all the facts and circumstances we have recited, we conclude that the van stop was investigatory in nature. The van stop would have comprised an effort to locate Cody, not to potentially help him, but to investigate how he drove the car into the ditch.

*Id.* at 5.

In the case before us, the officer was checking on a person reported to have been parked with the lights on from 3:30 a.m. When Officer Garcia arrived two hours later, the car was still there, its engine and lights were on, and the driver was non-responsive behind the wheel with his cellphone and wallet in his hands. When the officer opened the door, he smelled alcoholic beverages and the officer used extreme measures to arouse him. Officer Garcia testified he was first checking to "make sure he's okay. And then when I started observing all these clues [of

intoxication], it was, we need to move on further in this investigation." This is a very different situation than faced by the officer in *Smith.*

In *Coffman*, the supreme court noted several cases from other jurisdictions discussing the community caretaking exception to the warrant requirement. 914 N.W.2d at 246–52. We note two cases cited by the *Coffman* court have facts like the case here, and the courts' analyses are persuasive in concluding the community caretaking exception to the warrant requirement applied. *Id.* at 249–50 (citing *State v. Kleven*, 887 N.W.2d 740, 743–744 (S.D. 2016), and *Kozak v Comm'r of Pub. Safety*, 359 N.W.2d 625, 628 (Minn. Ct. App. 1984)).

In *Kleven*, an officer saw a vehicle parked on the side of the street in the early morning hours. 359 N.W.2d at 741. After waiting some twenty minutes, he decided to park his patrol car directly behind the defendant's vehicle and arranged for another patrol car to park directly in front. *Id.* The officer believed the driver was passed out or asleep. *Id.* The officer then knocked on the car window; the defendant stirred but did not acknowledge the officer. *Id.* The officer opened the door and detected the odor of an alcoholic beverage. *Id.* The driver was arrested and charged with driving under the influence. *Id.* The court determined that, given the circumstances, the officer had sufficient reason to conduct a health and safety check. *Id.* at 743. The *Kleven* court observed:

> "The law does not demand that an alert police officer must suppress his or her training and investigatory experience in carrying out the myriad of community caretaking functions society expects police officers to undertake for its protection." As we [have] recognized . . . , "[m]odern society has come to see the role of police officers as more than basic functionaries enforcing the law. From first responders to the sick and injured, to interveners in domestic disputes, and myriad instances too numerous to list, police officers fulfill a vital role where no other government official can."

Officer Gebers and Officer Smith may not have had a cause for concern at 1:00 or 1:40 a.m. when they noticed Kleven's vehicle parked while running. During both of those observations, it appeared to the officers that Kleven was looking at his mobile phone. However, at 2:00 a.m., the vehicle was still running, remained parked in the same spot, *and* the occupant looked to be sleeping or passed out. The fact Kleven could have been simply sleeping is of no consequence. Officer Smith had reason to walk up to Kleven's driver's-side window and attempt to make contact. Officer Smith knocked on the driver's-side window several times. Kleven did not acknowledge Officer Smith. He looked up for a moment and put his head back down. "These circumstances presented a crucial moment of judgment for" Officer Smith. Should he act to ensure Kleven is not in need of assistance—conduct a health and safety check? We think so. Under the circumstances, Officer Smith had sufficient reason to act.

*Id.* (third alteration in original) (internal citations omitted).

In *Kozak*, the defendant had parked on the side of the road and fallen asleep. 359 N.W.2d at 627. A deputy stopped to investigate and knocked on the window to awaken the driver. *Id.* The court found that a deputy's conduct was justified under the community caretaking exception. *Id.* at 628. The court stated, "In the proper performance of his duties, an officer has not only the right but a duty to make a reasonable investigation of vehicles parked along roadways to offer such assistance as might be needed and to inquire into the physical condition of persons in vehicles." *Id.* at 628. The court observed, "The occupant of an already parked car may be intoxicated, he may be suffering from sudden illness or heart attack, or may be just asleep. Surely, it is within a responsible peace officer's duty as it relates to the public to determine whether his assistance is needed." *Id.* We affirm the denial of the motion to suppress the results of this encounter.

*8:06 a.m. encounter.* Green challenges the stop of his vehicle after he was released from jail on the ground Officer Gebhardt did not observe the commission

of a traffic offense. But Officer Garcia reported his observations that Green was speeding, swerving, and recently released on an OWI to dispatch.[4] This was not an anonymous tip. Officer Gebhardt was entitled to rely on his fellow officer's report. *See State v. Thornton*, 300 N.W.2d 94, 97 (Iowa 1981); *see also Baker*, 925 N.W.2d at 612–13 ("Here, considering all of the information the officer had when he stopped [the defendant's] vehicle, we find the officer had reasonable suspicion to conduct the investigatory stop."). The court did not err in denying Green's motion to suppress.

*Consolidation/severance.* Green challenges the court's grant of the State's motion to consolidate and denial of his motion to sever. He argues the two OWI charges were not part of a common scheme or plan. Iowa Rule of Criminal Procedure 2.6(1) provides,

> Two or more indictable public offenses which arise from the same transaction or occurrence or from two or more transactions or occurrences constituting parts of a common scheme or plan, when alleged and prosecuted contemporaneously, shall be alleged and prosecuted as separate counts in a single complaint, information or indictment, unless for good cause shown, the trial court in its discretion determines otherwise.

The goals of the rule are "judicial economy and allowing prosecutors more leeway in charging multiple offenses." *State v. Lam*, 391 N.W.2d 245, 251 (Iowa

---

[4] We note that one of the reasons given by the trial court was that Officer Garcia observed Green driving while revoked in violation of section 321J.9. But the effective date of revocation under that section "shall be ten days after the department [of transportation] has mailed notice of revocation to the person by first class mail." Iowa Code § 321J.9(4).

While the trial court erred in finding Green's license was revoked, Officer Garcia reported to dispatch that Green had just been released after being arrested for OWI and was still showing signs of impairment as he was swerving and driving in excess of the speed limit (reaching sixty miles an hour) in city limits.

1986). Those twin goals inform the first part of the analysis under the rule—whether there was a common scheme or plan. *See Romer*, 832 N.W.2d at 182 (stating "the State had the right to charge multiple counts in the same offense to achieve judicial economy" in connection with whether there was a common scheme or plan). The second part of the analysis turns on whether there is good cause to sever the charges. *See State v. Elston*, 735 N.W.2d 196, 199 (Iowa 2007) ("Although the existence of a 'common scheme or plan' indicates the charges should be joined, the district court nonetheless had discretion to sever the charges for 'good cause.'" (citation omitted)). "To prove the district court abused its discretion in refusing to sever charges, [a defendant] bears the burden of showing prejudice resulting from joinder outweighed the State's interest in judicial economy." *Id.*; *see also Romer*, 832 N.W.2d at 183 (dividing the analysis into two parts and stating the second part is whether prejudice outweighed judicial economy).

The trial court granted the consolidation, writing:

> [Green] was found behind the wheel of a running vehicle allegedly under the influence. He was taken to the West Des Moines Police Station and charged with OWI and released to a sober driver. An hour later, the same officer sees [Green] driving the car in the same neighborhood. Hence two counts of OWI 1st.
> These trials arise from the same set of circumstances or occurrence considering it is one instance of alleged intoxication and one ongoing incident involving the same officer. Trial of the second incident will involve an explanation by the officer as to why [Green] was stopped a second time. Several witnesses will overlap. Judicial economy dictates consolidation. Pursuant to Iowa Rule of Criminal Procedure 2.6(1), these two instances could have been charged in the same trial information. Considering facts of one case will most likely be required to be discussed in the second case, judicial economy outweighs any prejudice to the defendant.

The jury was instructed:

> The defendant has been charged with two counts. This is just a method for bringing each of the charges to trial. If you find the defendant guilty or not guilty on any one of the two counts, you are not to conclude the defendant is guilty or not guilty on the other(s). You must determine whether the defendant is guilty or not guilty separately on each count.

"When the State charges crimes separately and the court gives a limiting instruction, we presume the jury follows the instruction, thereby minimizing any possible prejudice." *State v. Owens*, 635 N.W.2d 478, 483 (Iowa 2001). Green has not met his burden to show prejudice resulting from joinder outweighed the State's interest in judicial economy.

The court's rulings consolidating cases and denying Green's motion to sever were neither untenable nor unreasonable, and we find no abuse of discretion. We affirm.

**AFFIRMED.**